JOHN D. ADAMS et al., Appellees, v. IOWA GAS & ELECTRIC COMPANY, Appellant.

**PRINCIPAL AND AGENT:** Authority of Agent—Ipso Facto Notice of Limitation. A party signing a writing which provides that it shall not constitute a contract until it is signed and expressly approved by the *other* party thereto is given palpable warning that the agent of such *other* party has no authority to bind his principal by any final agreement.

Headnote 1: 2 C. J. p. 569.

*Appeal from Washington District Court.*—D. W. HAMILTON, Judge.

APRIL 7, 1925.

OPINION ON REHEARING OCTOBER 27, 1925.

ACTION in equity, to reform a contract and to enjoin the defendant from enforcing any terms or conditions other than as defined in the contract so reformed. The opinion sufficiently states the facts. The prayer of plaintiffs' petition was granted,

and a decree in conformity thereto was entered. Defendant appeals.—*Reversed.*

*Livingston & Eicher,* for appellant.

*H. W. Byers* and *Ralph H. Munro,* for appellees.

DE GRAFF, J.—Three actions were commenced by three groups of plaintiffs, respectively, against the defendant Iowa Gas & Electric Company, which is a private corporation engaged in the generation and sale of electric current, with its main plant and principal office in the city of Washington, Iowa. These actions were consolidated for the purpose of trial and decree, as the contracts involved are essentially alike, and the equitable relief sought by all the plaintiffs is the same. Plaintiffs are farm owners and consumers of electric current furnished them under contract with the defendant corporation.

In October, 1916, the defendant secured a franchise from the city of West Chester, Iowa, for a term of 25 years, which provided:

"Said company after a reasonable time to establish service shall, at all reasonable places within said town, furnish to those applying therefor electric current for light and power at reasonable prices, which shall not exceed 15 cents per kilowatt hour, but the minimum charged therefor may not be less than $1.00 per month for each connection."

In April, 1917, the company completed an electric transmission line from West Chester to Keota, Iowa, having secured a 20-year franchise giving it the right to use the public highways for the lines in controversy.

The transmission lines in question were constructed by the defendant in 1918 and 1919, under written contracts with the plaintiffs and others, as consumers of electric current. The only provision of this contract with reference to rates is as follows:

"Each of the undersigned consumers hereby agrees after the installation of said service line to take and pay for electricity for a period of one year from date of such connection at the rates charged for similar service at West Chester rate, Iowa, provided, however, that each consumer guarantees that each net

monthly bill for lighting service shall not be less than $3.00 which also permits the connection of a one-horse-power motor or less on the lighting service, the net monthly bill for all other power service to be on a separate meter shall be not less than $1.00 per horse power of motor installed.''

Two groups of plaintiffs signed contracts with the minimum charge fixed at $3.00, and one group with the minimum charge at $2.00; but this is a matter of detail not affecting the merits of the controversy.

· In April, 1922, the defendant corporation put into effect and attempted to charge higher rates than those specified in the contracts for the first year under the West Chester rate. This was the provocation for the commencement of the instant actions, predicated on a claimed oral agreement between the plaintiffs and the agent of the defendant who secured the signatures of the consumers to the contracts. Plaintiffs pray for relief in two particulars: (1) That said contracts be reformed so as to include the oral representation of the agent, to wit, that the defendant bound itself for 20 years to furnish electric current at the rate which plaintiffs agreed to pay for one year; and (2) that the defendant be enjoined from charging a higher rate than that defined in the contracts as so reformed.

It is the contention of the defendant that, in the absence of any other provision of the contract than the one heretofore quoted, there was a limitation of the time or period for which the defendant could be required to furnish current at the one-year rate fixed in the contract. It is the claim of plaintiffs that, prior to the signing of the contracts by them, one Gilbert Johnson, agent of the defendant, stated that the company, under the terms of the contract, was bound to furnish current at the contract rate for 20 years, or for the life of the West Chester franchise. Upon this representation, which plaintiffs contend is binding upon the company, reformation is asked, on the theory of mutual mistake of the parties.

We first determine whether such a representation, if in fact made, is binding upon the company, under the facts disclosed by the record; and second, whether such a representation, if in fact made, is sufficient to predicate mutual mistake warranting a reformation of the contract.

No fraud is alleged or claimed, and reformation, if decreed, must be bottomed on mutual mistake in the omission from the contract of the alleged 20-year rate provision. Who was Johnson? He was the employee of the defendant, in the capacity of a meter reader, house wirer, and lineman. His function in the premises was to present the printed contract to a prospective consumer and secure his signature thereto. He was accidentally killed in 1920, so that his alleged statements are not denied of record. It is shown, however, without dispute, that the manager and the president of the defendant corporation knew nothing of the alleged oral agreement until these actions were instituted; and both of these officers testify that Johnson had no authority to agree to anything not contained in the printed contracts. What do the contracts recite in this particular? The last paragraph provides:

"It is further agreed that this agreement shall not be binding upon the company until it shall have been signed and expressly approved by the president of the company."

All the plaintiffs can read the English language, and it must be presumed that each of them read the contract before attaching his signature. The language of the contract is not ambiguous, and the parties signing would readily understand its purport. See *Midland Mtg. Co. v. Rice*, 197 Iowa 711; *Reid, Murdock & Co. v. Bradley*, 105 Iowa 220.

The contract itself disclosed a limitation on the authority of Johnson to make a contract at all. The contract was in printed form, except certain blank spaces in which were to be inserted the maximum cost of construction and extension and the minimum rate. There was nothing for Johnson to do in the premises, as the agent of the defendant, except to deliver to the plaintiffs the printed form of contract for signature; and by its terms plaintiffs knew that it was subject to the express approval of the president. This negatived the authority of the agent to make the contract final, and was, in effect, a declaration that the agent had no authority to bind the principal. Johnson did not insert any 20-year clause, either before or after the contracts were signed by plaintiffs; and the uncontradicted evidence is that the signed contracts were turned over to the president without any suggestion that there had been any

talk or any agreement concerning the 20-year clause. The agent Johnson did not make these contracts for the company, nor arrange any of the conditions found therein. He had no authority to do either. It was not for the agent to construe or interpret the contract presented to the plaintiffs. This was no part of his duty; and whatever, if anything, he may have said as to the effect of the contract or what it should cover, constituted mere opinion on his part, and pertained to matters wholly outside the scope of his employment. *Murphy v. Continental Ins. Co.*, 178 Iowa 375; *Express Pub. Co. v. Aldine Press*, 126 Pa. St. 347. These matters are presumed to be merged and to be expressed in the contract; and, even conceding that the agent's representations amounted to contemporaneous inducing agreements, the plaintiffs had notice, before signing, that the contracts were subject to acceptance and were to be approved by the president. No opportunity was afforded the company to repudiate, as no notice or knowledge was brought home to the company of the alleged representations of the agent. No implication of law bound the defendant to furnish current after the first year at the rate specified for the one year during which the contracts required plaintiffs to take the current. The contract contained no specific rates binding upon either of the parties except for one year, but left the parties under the obligations implied by the common law: that is, to furnish current at reasonable rates, and, upon the part of the consumer, to pay reasonable rates, if he desired service. No issue, however, is presented in the instant case on the question of the reasonableness of the rates. The foregoing principle is stated to show that there are no inequities in the contractual relations between the parties. Unless it may be said that the representation of the agent was binding upon this defendant, the alleged mistake cannot be said to be mutual. It is elementary that, if one party is acting through an agent, it is necessary that he have authority to make the stipulations alleged to have been omitted from the contract; and further, if the other party is in a position to learn of the limitation upon the authority of the agent, or knows that his authority is limited, he cannot hold the principal beyond the limitations and the conditions contained in the contract. Mutual mistakes only make a contract reformable in equity. We are dealing

with the reformation of a contract,—not its rescission; and the former is a more delicate remedy than the latter. A mistake on one side may be ground for rescinding, but not for correcting or rectifying an agreement. *Green v. Stone*, 54 N. J. Eq. 387 (34 Atl. 1099).

Wherefore, the judgment and decree entered by the trial court is—*Reversed*.

FAVILLE, C. J., and STEVENS and VERMILION, JJ., concur.