ELIZABETH DISTASSIO, RESPONDENT, v. AMERICAN UNITED LIFE INSUR-
ANCE COMPANY, APPELLANT.—179 S. W. (2d) 610.

Kansas City Court of Appeals.   March 6, 1944.

*Robert A. Adams, John S. Marley* and *Sebree, Shook & Gisler* for appellant.

*Donald O'Hern, C. W. Crossan* and *Bruce Barnett* for respondent.

CAVE, J.—This suit is based on an alleged parol contract of life insurance on the life of Jennie Pitassi, daughter of plaintiff, for $1500, purporting to have been made by a representative of the defendant who had, or apparently had, the authority of a *general agent*. A jury was waived, trial by the court and finding and judgment for plaintiff in the sum of $2785, which included interest, penalties and attorneys' fees. Motion for new trial overruled, and appeal perfected.

Defendant contends its demurrer to the evidence should have been sustained. The evidence concerning the parol contract is found in the testimony of witness Tony Distassio, a son of the beneficiary, and a brother of the insured. He testified that about February 1, 1941, his sister, the insured, told him that she wanted to take out some life insurance and he communicated that fact to an acquaintance of his, Hazel Chapman, who was an insurance agent and worked for one

Thomas Evilsizer, who is the person charged to have made the parol contract sued on. Miss Chapman told him that she would have an agent call on his sister. On that same day, Evilsizer came to his home and met the insured and discussed with her the question of taking out a life insurance policy. They did not arrive at an agreement on that day because his sister was undecided whether she wanted a $1500 or a $2000 policy. Within a few days, she decided to take a $1500 policy and had him telephone Evilsizer, who came to his home, and the following conversation took place between Evilsizer and the insured: "Q. Now, did your sister advise him that she wanted a $1500 policy? A. Yes, sir. Q. That was the smaller amount discussed? A. Yes, sir. Q. The other was $2000? A. Yes, sir. The other was $2000. Q. Did he tell her how much the premium would be on the policy for three months? A. Yes, sir. Q. Do you remember the amount? A. $10.58 —I am not sure. Q. Did Mr. Evilsizer ask your sister any questions at that time? A. Yes, sir. He asked her name and her age and where she lived at and who she wanted to leave the insurance to. Q. Did he ask her also about the name of her doctor? A. Yes, sir. Q. And asked her who the insurance would be payable to? A. Yes, sir. Q. What did she tell him about the insurance being payable? A. She wanted it left to her mother. In case of her mother's death, she wanted it left to her daughter. Q. What is the mother's name? A. Elizabeth Distassio. Q. And the daughter's name? A. Amalia Pitassi. Q. Did Mr. Evilsizer then ask her to pay him the ten dollars and some cents premium? A. Yes, sir. Q. What did your sister say? A. Well, she didn't want to pay it unless she got the policy. Q. What did Mr. Evilsizer then say to her? A. Well, he said that it was always best to pay a little because she would be insured from that day on and then he went on to tell her the story about this fellow getting killed. . . . Q. When did Mr. Evilsizer tell her her insurance would commence? A. At the time she paid her premium. Q. And she did pay him the premium? A. No, she didn't have it all and she paid him $5. Q. $5? A. Yes, sir. Q. Now, how did she happen to pay only $5. A. Well, he said "if you don't have it all, I will be glad to take $5", and the rest when he delivered the policy. Q. I believe you said she borrowed the money from you? A. Yes, sir. Q. And she gave it to Mr. Evilsizer? A. Yes, sir. Q. Did Mr. Evilsizer, after she paid the money, tell her that she was insured right at that time? A. Yes, sir, he told her. Q. Now, after that, did Mr. Evilsizer have her sign a blank paper? A. Yes, sir. Q. What did he tell her when he asked her to sign that? A. Not anything. He told her to sign it and he would fix it up and send it in to the insurance company. Q. He said that he would fix it up and send it in? A. Yes, sir. Q. Did he read anything to her in that application? A. No, sir. Q. Did he read to her any part of that application that said that it was agreed that the insurance would not

be effective until a policy had been delivered to her? A. No, sir. Q. He simply asked her to sign the blank paper? A. Yes, sir. Q. And told her he would fill it up later? A. Yes, sir. Q. And you say your sister died on February 11, 1941? A. Yes, sir.''

It is in evidence that the insured did sign an application for a $1500 life insurance policy at the time of the above conversation, and that Evilsizer sent the application to defendant's home office in Indianapolis, Indiana, and in due time a policy was issued and sent to Evilsizer, who went to insured's home for the purpose of delivering it and found that she had died several days prior, and the policy was never delivered to any one. He returned the $5 to Tony Distassio, which had been paid to him at the time of the above conversation, and it was accepted.

With reference to the question of whether Evilsizer was held out to the public as having the apparent authority of a *general agent,* we will not detail all such evidence, but when we consider the admissions made by defendant's counsel to the court at the beginning of the trial, together with Evilsizer's contract of employment by defendant, the business card which he presented to the insured at the time he called on her designating him as general agent of the defendant company, and the letterheads so designating him, together with other facts, we conclude that there was sufficient evidence for the insured to believe, and for the trial court to find, that Evilsizer had the apparent authority of a general agent at the time of his conversation with insured.

It is the law in this State that when an insurance company holds out an agent as its general agent and a third party dealing with him did not know of any restrictions or limitations on the agent's authority, or is not charged with such knowledge, then, so far as that third party is concerned, the authority of the general agent is as broad as his title would indicate. [Lanowah Inv. Co. v. John Hancock Mutual Life Ins. Co., 162 S. W. (2d) 307; Patterson v. Prudential Ins. Co., 23 S. W. (2d) 198, 201; Gaines v. Berkshire Life Ins. Co., 228 Mo. App. 319, 68 S. W. (2d) 905; James H. Forbes Tea & Coffee Co. v. Baltimore Bank, 345 Mo. 1151, 139 S. W. (2d) 507.] In the last case cited, the Supreme Court said, l. c. 509:

''Where a corporation puts the agent forward as a general agent or manager or places him in a position where others are justified in the belief that his powers are general, the restrictions that may be imposed privately on the agent are immaterial, except as between the corporation and the agent, and cannot affect the rights or remedies of third parties dealing with the agent *who have no knowledge of such restrictions.*'' (Italics ours.)

It follows that if the third party had actual or constructive knowledge of restrictions and limitations on the authority of the general agent, then they must contract with him with those restrictions and limitations in mind and cannot blindly rely on his apparent authority.

[See cases, *supra,* and Vol. 2, American Jurisprudence, sec. 99, page 80, and cases there cited.]

Defendant contends that the application signed by insured contained definite and certain limitations and restrictions on the powers and authority of its agent to make a binding parol contract, and that when she signed said application, she was charged with the knowledge of such limitations and restrictions, whether she actually read them or not.

We understand plaintiff's theory to be that defendant's agent and the insured entered into a definite and complete parol insurance contract prior to the time she signed the application, and that the application was merely an offer or proposal on her part to enter into a new and different contract of insurance, evidenced by a written policy, and that since said policy was not issued and accepted by insured prior to her death, the application never ripened into a written contract. We cannot lend assent to such a construction of what occurred, and what the parties intended at the time of the conversation above set out and the signing of the application. It seems clearly apparent that the applicant and Evilsizer had in contemplation and were discussing, a written policy of insurance, rather than a final complete parol contract. This is apparent, not only from the written application signed, but from the oral testimony as above set out. They at all times referred to *the policy*. She didn't want to pay the quarterly premium until "she got the policy". She knew she was to receive *a policy,* and when they were discussing the effective date of the insurance, it is apparent they were referring to and considering the effective date of the policy. She didn't pay the full amount of the quarterly premium, but accepted his suggestion that she pay $5 on account, and he would collect the balance "when he delivered the policy". We conclude that the oral conversation and the signing of the application were contemporaneous and that the insured is charged with notice and knowledge of any limitations and restrictions on the agent's authority contained in said application. And this is true, whether she actually read it or not. [Herndon v. Triple Alliance, 45 Mo. App. 426; Mathews v. N. Y. Life Ins. Co., 128 S. W. (2d) 327; Peoples Life Ins. Co. v. Parker, 20 S. E. (2d) 485; Chamberlain v. Prudential Ins. Co., 109 Wisc. 4; Flannagan v. Northwestern Mutual Ins. Co., 152 Va. 38.]

The evidence will not support plaintiff's contention that the alleged parol contract was complete, final and a closed incident at the time insured signed the application, and that the signing of the application was an entirely new and independent proposal looking to a new, independent and different insurance contract. Such a contention has no substance under the evidence.

Therefore, we consider the question, did the written application contain limitations and restrictions on the authority of the agent to

bind the defendant as charged? Among other things, the application provided:

"I hereby apply for insurance . . ."

and,

"I agree (a) that the American United Life Insurance Company shall have such time as it shall deem necessary to accept or reject this application for insurance."

and,

"No statements, promises, representations, notices, or information, made or given by the person soliciting or taking this application or by or to any other person shall be binding on the company or in any way affect its rights, unless same be reduced to writing and adopted by the company at its home office as a part of this application."

and also provided:

"I hereby expressly agree that the insurance hereby applied for shall not take effect unless and until the first premium shall have been paid and the policy delivered to me during my lifetime and sound health; except that, if the first premium is paid in advance to an authorized agent of the company, and the binding receipt attached to and bearing the same number as this application given me by such agent, and if this application is approved by the company at its home office on the form and for the amount applied for during my lifetime and while in good health, then such insurance shall be effective (subject to the provisions of the policy applied for) from the time of such final approval by the company."

and further provided:

"I have settled for the policy applied for with the agent in the following manner: $10.52 in cash . . . for a quarterly premium on condition that, if risk is not assumed by the company, the sum paid by me shall be returned in accordance with the provisions of the binding receipt (as numbered below) which I have read and accepted subject to the provisions thereof."

It is the law that a principal may limit and circumscribe the authority of a general agent as well as a special agent. In Slocum v. New York Life Ins. Co., 228 U. S. 364, 57 L. Ed. 879, the Supreme Court of the United States said, l. c. 885:

"One who deals with an agent, knowing that he is clothed with a circumscribed authority and that his act transcends his powers, cannot hold his principal; and this is true whether the agent is a general or a special one, for a principal may limit the authority of one as well as of the other."

It seems clear to us that the agent's authority for making parol agreements and representations was definitely limited by the provisions of this application, and that insured had knowledge thereof. A somewhat analogous question was presented in Salisbury v. Indiana &

Ohio Live Stock Ins. Co., 202 S. W. 412. In that case, this court said, l. c. 413:

"It is contended by plaintiff that the agent was a general agent of the defendant, and had power to make oral contracts of insurance. . . . The applications themselves, which plaintiff signed, stated that the agent had 'no power or authority to bind the company by any promise, agreement, statement, or representation.' The evidence shows that the only form of contract of insurance contemplated by the parties was by written policies to be issued by the defendant upon the written application of the plaintiff, and there is no evidence whatever that there was any intention or understanding by plaintiff that the contract was to be made in any other form. *The agent's authority was limited, and plaintiff knew of the limitation. Under such circumstances, even if the agent were clothed with apparent authority to make contracts of insurance, it could not affect the situation, as plaintiff was apprised of the limited authority, and consequently plaintiff cannot rely upon any alleged oral contract of insurance made by the agent.* [Brownfield v. Phoenix Ins. Co., 26 Mo. App. 390; Carson v. Culver, 78 Mo. App. 597.] (Italics ours.)

It must be kept in mind that we are here discussing the question of notice of the limitations on the agent's authority only, and not a situation where the statements or answers or information are written in by the agent.

The limitations referred to in the Salisbury case are almost, if not, identical with the limitations in this application, and we see no reason to depart from the ruling in that case. We have been cited to no other cases to the contrary. The other quoted provisions of the application also restrict the authority of the person soliciting insurance, but we need not discuss them in detail.

Plaintiff argues that the application "does not contain a word with reference to any limitations upon the general agent's authority . . ." There is no merit in this contention, because the application places the restrictions on "the person soliciting or taking this application . . ." Such language is broad enough to include a general as well as a special or soliciting agent. She also argues that "the applicant does not state that she is aware of any limitations upon the general agent's authority, but merely that she offers to agree that the general agent's statements shall not be binding on appellant. The application was an offer to enter into a contract which was never entered into, and, for that reason, said application had no legal effect." We think plaintiff misunderstands the point under discussion. We are here discussing and deciding only the question of whether the contents of the application limited and restricted the authority of the agent to make the contract sued on, and whether such limitations and restrictions were brought to the knowledge of the insured. There are cases, in other jurisdictions, where the facts are

very similar to those in the present case, that hold that the application, signed under the circumstances as in this case, becomes a written contract, and therefore all prior oral negotiations are merged into such contract. Some of such cases are: Bankers' Reserve Life Co. v. Yelland, 41 Fed. (2d) 684; Chamberlain v. Prudential Life Ins. Co., *supra.* But we deem it unnecessary to discuss that theory.

In support of her contention that the parol contract sued upon was not merged into the application because such application did not become a written contract, plaintiff cites: Knight v. Glenn Falls Ins. Co., 20 S. W. (2d) 941; Levine v. Hochman, 217 Mo. App. 76; Bowers v. Bell, 193 Mo. App. 210; and three cases from other jurisdictions. We have considered those cases and have no quarrel with the general principle of law announced; but under our view of this case, they have no application. They are not life insurance cases dealing with the question of the effect of a written application on prior oral conversation. They deal with situations where the contract is part oral, part written, and cases where the oral conversations have to do with the performance of the contract.

It is our conclusion that under the facts in this case, and as was held by this court in the Salisbury case, *supra,* plaintiff cannot rely upon an alleged oral contract of insurance made by the agent. It follows that the judgment of the trial court must be reversed. It is so ordered. *Bland, J.,* concurs; *Shain, P. J.,* not sitting.