**MOTOR TRANSPORTATION SPRINGFIELD, Appellant,**

v.

**ORVAL DAVIS TIRE CO., INC., Respondent.**

No. 10697.

Missouri Court of Appeals, Southern District, Division One.

July 5, 1979.

Motion for Rehearing or to Transfer Denied July 31, 1979.

Application to Transfer Denied Sept. 11, 1979.

William A. R. Dalton, B. H. Clampett, Daniel, Clampett, Rittershouse, Dalton & Chaney, Springfield, for appellant.

Harold J. Fisher, David L. Smith, Woolsey, Fisher, Whiteaker & Stenger, Springfield, for respondent.

FLANIGAN, Chief Judge.

Plaintiff, by written agreement, leased to defendant a 1973 International Harvester diesel tractor for a period of one year commencing February 13, 1974. Defendant used the vehicle for almost 11 months and on January 3, 1975, gave plaintiff written notice of its intent to cancel the lease. At the time of cancellation, in accordance with the provisions of the lease, defendant tendered to plaintiff "an additional 10 percent cancellation charge on the total amount invoiced to date of cancellation." The 10 percent amounted to $975.75. The tractor was returned to plaintiff on January 10, 1975.

Plaintiff refused to cash defendant's check representing the tendered amount of $975.75 and took the position that the amount owing plaintiff under the lease, in addition to the sums defendant had previously paid on a monthly basis, amounted to $6,994.47. The lease also provided that the lessor was entitled to "all costs and expenses, including reasonable attorney's fees, in collecting amount due from lessee." The parties stipulated that a reasonable attorney's fee would be $1,200. The petition sought $6,994.47 plus attorney's fees.

Defendant's answer admitted execution of the written agreement and alleged that plaintiff had refused defendant's tender of $975.75. The answer also pleaded that plaintiff's employee, Don Boyer, had told defendant that, upon cancellation, defendant's sole additional responsibility would be 10 percent of the total amount invoiced to date of cancellation. Defendant sought reformation of the lease so that, as reformed, it would be in accordance with Boyer's oral representation. That representation was the factual basis upon which several defensive theories, including fraud and mutual mistake, were pleaded.

The trial court, sitting without a jury, found that the lease "plainly" called for the amount demanded by plaintiff. However, the trial court also found that the lease should be reformed "because of mutual mistake." The judgment of the trial court awarded plaintiff $975.75. Plaintiff appeals.

Review of this court-tried case is governed by Rule 73.01 [1] par. 3, as construed in *Murphy v. Carron,* 536 S.W.2d 30, 32[1] (Mo. banc 1976).

Essentially, it is the position of plaintiff that the trial court erred in not granting

---

1. Unless otherwise indicated, all references to Rules are to Missouri Rules of Court, V.A.M.R., and all references to statutes are to RSMo 1969, V.A.M.S.

plaintiff the relief prayed for by the petition because: (a) the provisions of the lease were plain, (b) under the undisputed evidence, defendant operated the tractor for 52,124 miles, thereby entitling plaintiff to the sum of $6,994.47 [2] and (c) the evidence is insufficient to relieve defendant from its obligations under the lease based on the alleged defenses of fraud or mutual mistake.

Defendant's brief as respondent here seeks to uphold the judgment of the trial court on the ground of mutual mistake.

**2.** In addition to attorney's fees and costs, the petition sought $6,994.47, which was the sum of the 10 percent cancellation charge ($975.75) and $6,018.72 based on the actual mileage of 52,124. Application of the mileage rates of 18.6 cents and 12.9 cents, set forth in Schedule A, to the mileage total of 52,124 will not produce $6,018.72. The reason for the variation is that another provision of the lease triggered a change in the mileage rate per mile shown on Schedule A based on a change in the level of the Consumer Price Index published by the U. S. Department of Labor. The parties agree that plaintiff's computations which produce the figure of $6,018.72 are accurate.

**3.** VEHICLE LEASE AGREEMENT

"THIS AGREEMENT is made between [plaintiff], hereinafter called OWNER, and [defendant], hereinafter called LESSEE.
1. PROPERTY COVERED AND TERM:
OWNER does hereby lease to LESSEE the motor vehicle or vehicles described in "Schedule A" attached hereto and made a part hereof. This lease shall become effective with respect to each vehicle on the Delivery Date for that specific vehicle as set forth in "Schedule A" for a period of one (1) year from the respective Delivery Date of each said vehicle, and from year to year thereafter until terminated as hereinafter provided.
2. OWNER AGREES:

3. LESSEE AGREES:
A. To lease the vehicles described in "Schedule A" and all supplements or additions thereto and to pay OWNER all charges provided herein without deduction or set-off within seven (7) days of receipt of invoice from OWNER.

M. To pay OWNER for all costs and expenses, including reasonable attorney's fees, in collecting amount due from LESSEE hereunder or in enforcing any of OWNER'S rights hereunder.

Plaintiff's appeal is meritorious.

The agreement between the parties consists of three parts: Vehicle Lease Agreement (four printed pages), Schedule A (one page), and Schedule B (one page). All three parts were signed on behalf of defendant by its vice president Warren Davis on February 13, 1974, in Bolivar. The three parts had previously been signed, on behalf of the corporate plaintiff, by one of its officers, Laurence Kuda, in St. Louis. Pertinent portions of the three parts are set forth below.[3]

4. IT IS MUTUALLY AGREED:

.        .        .        .

B. That mileage shall be determined from Hubometer readings taken weekly.

.        .        .        .

F. That this agreement, together with "Schedule A", and any supplements or additions thereto which may be executed and attached hereto, constitute and will constitute the full, complete, absolute and entire agreement between the OWNER and LESSEE; that there are no oral representations, agreements or understandings affecting this instrument; that any future representation, agreement, understanding or waiver, to be binding upon the parties hereto, must be reduced to writing and attached hereto, and that the OWNER'S failure strictly to enforce any provision of this agreement shall not be construed as a waiver thereof, or as excusing the LESSEE from future performance.

.        .        .        .

5. MODIFICATIONS:
SEE Schedule "B" of Vehicle Lease Agreement attached hereto.
6. TERMINATION PRIVILEGES:
A. After the original term of this lease as set out in Paragraph 1 herein, either party may cancel this agreement as to any part of the equipment leased hereunder by giving to the other party sixty (60) days' written notice of intent to do so. In such event LESSEE shall purchase the cancelled vehicles for cash on the cancellation date by paying the sum of the "Original Value" less the total depreciation which has accrued for each vehicle as set forth in "Schedule A", plus any unexpired licenses and applicable taxes except, however, that there shall be no repurchase requirement as to a designated vehicle on or after the end of the "Depreciation Period" specified in "Schedule A."

SCHEDULE "A" OF VEHICLE
LEASE AGREEMENT
1 .   .   .

.        .        .        .

5. Vehicles leased hereunder:

Defendant operated the vehicle for 52,124 miles in slightly under 11 months. Under Schedule A, where the mileage is less than 100,000 per year, the rate is 18.6 cents per mile for the miles operated plus 12.9 cents per mile for the difference between 100,000 miles and the miles actually operated. The parties, and the trial court, have used the term "deficit mileage" in referring to the 12.9 cents portion of the combination rate.

Defendant's answer claimed that paragraph B of Schedule B "superseded the deficit mileage provisions in Schedule A." That position is untenable. Paragraph B of Schedule B replaces, as it plainly says, Article 6, Paragraph A of the vehicle lease agreement. Indeed, if the deficit mileage provisions of Schedule A were deleted, there would be *no* prescribed mileage rate under the instant facts because the 18.6 cents rate comes into play only if the vehicle is driven 100,000 miles in one year.

The trial court in its judgment said: "According to the contract as written, the plaintiff would be entitled to the full amount of the prayer of its petition, with interest and attorney's fees. The contract plainly calls for 'deficit mileage' even though the contract is cancelled in the first year."

Defendant in its brief as respondent has not attacked the soundness of that finding. This court agrees with the trial court that the agreement is plain. The only reasonable construction of it is that which the plaintiff claims, the trial court found, and defendant does not here dispute.

The controlling issue is whether or not certain statements made by plaintiff's salesman, Don Boyer, to defendant's vice president, Warren Davis, constitute a defense to plaintiff's demand which is otherwise clearly due.

Testimony concerning the content of Boyer's statements came from defendant's witnesses Warren Davis, Robert Sawyer and two other employees of defendant. The trial court received the testimony of the four witnesses subject to the continuing objection of plaintiff.

| Delivery Date | Make | Type | Depr. Period | Fixed Chg. per week | Mileage rate per mile |
|---|---|---|---|---|---|
| 2/13/74 | 1973 I.H. Model COF 4070 | Tandem Axle Diesel Slpr Tractor | 1 year | None | For first 100,000 miles per yr. per unit $.186 / Excess of 100,000 miles per yr. per unit .097 / For any tractor as described hereon, operating less than 100,000 miles per year, the rate will be $.186 per mile for the miles operated plus $.129 per mile for the difference between 100,000 miles and the miles actually operated. |

SCHEDULE "B" OF VEHICLE
LEASE AGREEMENT
Dated 2/13/74
MODIFICATIONS

The following changes and additions were made in this agreement before it was signed by the parties hereto:

A.  . . .

B.  Agree that under Article 6—Termination Privileges Paragraph A shall be excluded in its entirety and replaced with the following wording:

"Owner and Lessee agree that the vehicle shown in Schedule 'A' is subject to cancellation at any time on giving to the other party thirty (30) days' written notice of intent to do so. In the event the vehicle as shown in Schedule 'A' is cancelled by Lessee prior to one (1) year from the Delivery Date as shown in Schedule 'A', Lessee agrees to pay to Owner an additional 10 percent cancellation charge on the total amount invoiced to date of cancellation thereof, on the vehicle as shown in Schedule 'A'."

Defendant employed approximately 40 people and did an annual business of $2,000,000 to $3,000,000. In its operations, in addition to the tractor leased from plaintiff, defendant used about 15 trucks which it owned. Warren Davis, who was 40 years old at the time of his negotiations with Boyer, was defendant's vice president and "active manager." Davis had worked for the defendant since he graduated from Drury College, 15 years earlier, with a degree in economics and business administration.

As the principal witness for defendant, Davis, on direct examination, was asked what Boyer had told Davis, prior to the signing of the agreement concerning "the obligations of [defendant] if this lease agreement were cancelled prior to it being in existence for the full year." This testimony ensued:

"A. Well, when he tried to get us to sign the lease the first time, we refused to sign it because of the 100,000 miles so the proposal was, if there was a 10 percent clause for cancellation at any time prior to the one year, added to the lease where the only liability we had, provided we cancelled before the termination of the lease, we would pay 10 percent only, 10 percent of the billing to date, which was $9,757.00 and we would be liable for $975.00 upon the time we did terminate and cancel January 3rd, and upon return he explained that the only liability we had was the 10 percent cancellation clause, but—

Q. Go ahead.

A. If we used it a full year, run out the full twelve months we would be liable for all.

Q. Including the deficit mileage?

A. Yes. There would be no deficit mileage, just the 10 percent cancellation.

Q. If cancelled prior to the end of the year?

A. Yes."

Defendant elicited the following testimony from its witness Robert Sawyer:

"Q. Were you present during the meeting which Mr. Warren Davis just talked about when that was signed on February 13, 1974?

A. Yes, sir, I was.

Q. What did Don Boyer say regarding the obligation of the Davis Tire Company if the lease was terminated prior to one year?

A. It would be a 10 percent penalty of all monies paid prior to that date.

Q. What, if anything, did Mr. Boyer say regarding the deficit mileage if it was terminated prior to one year?

A. If we terminated prior to one year then the 10 percent would apply; that we could pay 10 percent of the fees we had paid for rental of the truck to that date and that would terminate our contract.

Q. My question was, did he say whether or not you would be obligated to pay deficit mileage?

A. No, sir, he didn't.

Q. He didn't say one way or the other?

A. He said if we cancelled the contract prior to one year that we would be obligated only 10 percent, you know, of the monies paid in on rentals to that point. If we retained the unit the full year then, in turn, we would be billed for the deficit mileage.

Q. If you kept it for one year?

A. If we kept it for one year or the full contract."

Two other witnesses of defendant claimed to have knowledge of what Boyer had told Davis. They were present while Davis and Sawyer testified. These two witnesses testified simply that they had heard the testimony of Sawyer and Davis and that "the testimony of Warren and Bob as to the conversation was what the conversation was with Boyer."

Warren Davis testified, as a witness for the defendant, that his negotiations with

Boyer took place over a period of 30 to 60 days before the agreement was signed. Davis knew that the agreement reached with plaintiff had to be submitted to plaintiff's St. Louis office for approval. Davis admitted that he read all three parts of the agreement, signed all three parts, and did not make any changes or deletions.

From the foregoing it will be seen that the statements allegedly made by Boyer to Warren Davis, upon which defendant relies as its defense, consist of the opinion of a layman with regard to the legal effect of the written agreement in the event defendant, in the future, exercised its cancellation privilege.

"One cannot defeat the enforcement of a provision of a deed or contract by a mere showing that the other party *misrepresented its legal effect or gave assurances that the same would not be binding or enforced.*" (Emphasis added.) *St. Joseph Lead Co. v. Fuhrmeister,* 353 Mo. 232, 182 S.W.2d 273, 279 (1944). See also *MacLeod v. Skiles,* 81 Mo. 595, 604 (1884); *Deming Inv. Co. v. Wasson,* 192 S.W. 764, 765 (Mo. App.1917); *Betts v. Harvey,* 297 S.W. 995 (Mo.App.1927); *England v. Houser,* 178 Mo. App. 70, 163 S.W. 890 (1914).

In *Higgins v. American Car Co.,* 324 Mo. 189, 22 S.W.2d 1043 (1929), the defendant in a personal injury action relied upon the defense of release. Plaintiff challenged the validity of the release on the ground that the agent of defendant had told plaintiff, when the release was signed, that it was "merely a receipt." In upholding the validity of the release the supreme court said, "The rule is that the one who signs a paper without reading it, if he is able to read and understand, is guilty of such negligence in failing to inform himself of its nature that he cannot be relieved from the obligation contained in the paper thus signed, unless there was *something more than mere reliance upon the statements of another as to its contents.*" (Emphasis added.) *Higgins* at 1044. See also *Sanger v. Yellow Cab Company, Inc.,* 486 S.W.2d 477, 481[3] (Mo. banc 1972).

"False representations as to the legal effect of an instrument are no bar to an action thereon, as a party signing such an instrument is presumed to know its contents and *has no right to rely on the representations of the other party as to its legal effect.*" (Emphasis added.) *Hartley Realty Co. v. Casady,* 332 S.W.2d 291, 293 (Mo. App.1960). See also *Emily v. Bayne,* 371 S.W.2d 663, 668 (Mo.App.1963). As *Emily* points out, the general rule is subject to "two well-recognized exceptions: (1) [w]here there is a relation of trust and confidence between the parties . . . ; and (2) where one party is possessed, or professes to be possessed, of a superior knowledge *of the law* and takes advantage of the other party's ignorance *of the law* to mislead him . . . ." (Emphasis added.)

In the case at bar Warren Davis was a college graduate and an experienced businessman. No confidential relationship existed between defendant and plaintiff. Davis read the agreement before signing it. No relation of trust and confidence existed between Davis and Boyer. There is no showing that Boyer, a layman, had superior knowledge of the law. Boyer, who did not testify and who had left the services of plaintiff before the trial, was not himself a party to the agreement.

It follows that the statements attributable to Boyer do not constitute fraud and defendant's contractual obligation may not be avoided by relying upon such statements to support the defense of fraud. The trial court did not base its judgment on fraud and the appellate brief filed by defendant's able counsel does not seek to uphold the judgment on the ground of fraud.

The question arises, may Boyer's statements constitute a defense (and ground for the relief of reformation) upon the grounds of *mutual mistake.*

"[W]hen by mutual mistake a contract or other instrument is not expressed in such terms as have the force and effect that the parties intended, then it is the clear duty of the court to correct the mistake. This power of a court of equity to reform an instru-

ment, which by reason of mistake fails to express the intention of the parties, has long been considered unquestionable. * * and a court of equity will exercise this power not only as between the original parties, but as to those claiming under them in privity * * *. However, a mistake affording ground for the relief of reformation must be mutual and common to both parties to the instrument. It must appear that both have done what neither intended. * * and that mutual mistake, in order to justify granting the relief of reformation, must be established by clear and convincing evidence." *Leimkuehler v. Shoemaker*, 329 S.W.2d 726, 730 (Mo.1959).

It is arguable that if plaintiff were an individual and not a corporation and had himself made the statements, that evidence, standing alone, should not be sufficient to show a mistake on plaintiff's part because such a holding would circumvent the foregoing cases dealing with the insufficiency of the statements when presented under the theory of fraud. Merely branding the same evidence as "mutual mistake" should not give it sufficiency which it otherwise would lack. Under the instant facts, however, the soundness of that argument need not be determined.

There is nothing in the record to show that plaintiff was mistaken as to the contents of the agreement. Plaintiff's witness Jack Amon, its vice president, pointed out that under other provisions of the agreement (not heretofore quoted) plaintiff pro-

vided "full service and full maintenance" for the diesel tractor, except for the diesel fuel itself. Plaintiff's fixed costs were spread over a one-year period and over 100,-000 miles. Those fixed costs, including depreciation, interest and licensing expenses, were "built into" the mileage rates set forth in Schedule A.

Although the record shows the contents of Boyer's statements, it does not show whether or not Boyer himself believed those statements. If he did not believe them, he was not mistaken. If he believed them, he was mistaken, but that is not equivalent to a showing that *plaintiff* was mistaken.

"Where the agreement set up as the actual one is that made by an agent of defendant, plaintiff must show that the agent had authority to make it." 76 C.J.S. Reformation of Instruments § 28 d, p. 368. To the same effect see 66 Am.Jur.2d Reformation of Instruments § 23, p. 552.[4]

Paragraph 4(F) recites that the agreements (all three parts) "constitute and will constitute the full, complete, absolute, and entire agreement between the OWNER and LESSEES: *that there are no oral representations, agreements or understandings affecting this instrument;* that any future representation, agreement, understanding or waiver, to be binding upon the parties hereto, must be reduced to writing and attached hereto . . ."[5]

Boyer was plaintiff's salesman. Defendant's witness, Warren Davis, testified that

---

4. "The agent, Johnson, did not make these contracts for the company nor arrange any of the conditions found therein. He had no authority to do either. It was not for the agent to construe or interpret the contract presented to the plaintiffs. This was no part of his duty, and whatever, if anything, he may have said as to the effect of the contract, or what it should cover, constituted mere opinion on his part and pertained to matters wholly outside the scope of his employment." *Adams v. Iowa Gas & Electric Co.,* 200 Iowa 782, 203 N.W. 229, 231 (1925).

5. See 75 A.L.R. 1032 which deals with this related topic, "Provision in Sale Contract to the Effect That Only Conditions Incorporated Therein Shall Be Binding." See also, with respect to *sales,* § 400.2–202 and § 400.2–209(2).

It is unnecessary to decide whether this appeal would have reached the same result even if the agreement did not contain paragraph 4(F). In 30 Am.Jur.2d Evidence § 1019, p. 155, it is said: "The parol evidence rule, which forbids proof of an oral agreement to add to or vary a valid written agreement, is *particularly* applicable where the writing contains a recital that it contains the entire agreement between the parties, and that all prior negotiations and agreements are merged therein, and that all additions to or alterations or changes in the contract must be in writing and signed by both parties. Such a stipulation announces and demonstrates the all-inclusive nature of the written instrument and furnishes *additional* reason for applying the parol evidence rule." (Emphasis added.)

he knew that the agreement, so far as plaintiff was concerned, "had to be submitted back to St. Louis for home office approval." Although Davis also testified "as far as we knew, [Boyer] had complete authority," that testimony was not based on anything other than what *Boyer himself had said.* Davis read the agreement, including paragraph 4(F), before signing it.

"Although an agent is a competent witness to establish his own agency . . . agency cannot be established by proof of acts, declarations or conduct of the alleged agent, *unless same are known to the principal* or are so often repeated that knowledge on the part of the principal is implied. . . Thus Bitkower's alleged statement to defendant (not shown to have been known to Wyler Watch) that 'he was president of the Western Division, and whatever he said went,' did not establish Bitkower's authority." *Wyler Watch Agency v. Hooker,* 280 S.W.2d 849, 855[9] (Mo.App.1955).

Provisions similar to paragraph 4(F) were considered in *Werner v. Welsh Co.,* 247 S.W.2d 311 (Mo.App.1952); *Distassio v. American United Life Ins. Co.,* 238 Mo.App. 279, 179 S.W.2d 610 (1944); and *Curtiss Candy Co. v. National Finance Corp.,* 228 Mo.App. 609, 71 S.W.2d 833 (1934), and were held to be sufficient notice to the other contracting party of the limitation of the agent's authority. "It is always competent for a principal to limit the authority of an agent and if such limitations are brought to the attention of the party with whom the agent is dealing, the power to bind the principal must be found within the limited authority of the agent." *Werner,* at 313.

"The defendant insurance company, like any other principal, is responsible only for the acts, representations and agreements of an agent when done or made within the limits of his real or apparent authority. The burden was upon the plaintiff to show that White, the solicitor, had the (real or apparent) authority to make the agreement or representation which plaintiff claims . . . .; *and proof of his authority could not be made solely by relating alleged statements made by him.* . . . ." *Dic-*

*kinson v. Bankers Life & Cas. Co.,* 283 S.W.2d 658, 662 (Mo.App.1955).

"While a corporation ordinarily is bound by the knowledge of its agents . . . ., *the agent's knowledge of his own unauthorized act,* not brought home to the authorized corporate board, officer or agent, cannot be imputed to the corporation." *Trice v. Lancaster,* 270 S.W.2d 519, 524 (Mo.App. 1954). See also *Seibel v. Harry S. Surkamp Investment Co.,* 328 S.W.2d 179, 186 (Mo. App.1959).

There is no evidence that anyone employed by plaintiff, other than Boyer himself, knew that Boyer had made the statements to Davis.

The record shows that immediately prior to sending the cancellation notice Warren Davis telephoned Boyer. Boyer repeated the same statements which he allegedly made prior to the signing of the agreement. This additional circumstance does not aid defendant's position.

This record shows that Boyer made certain oral representations not amounting to fraud; that he lacked authority to make them; that Warren Davis read the agreement before signing it; that the agreement said, in effect, that Boyer had no authority to make oral representations; that plaintiff had no knowledge that Boyer had made such representations. Under these circumstances the statements attributable to Boyer do not furnish evidentiary support for a finding that *plaintiff* was mistaken with respect to the contents of the agreement. It follows that the trial court erred in finding the existence of mutual mistake.

■ On January 23, 1975 defendant received the invoice from plaintiff, showing the amount due under the lease to be $6,994.47. Under the agreement payment was due within seven days from receipt of invoice. This court finds that a reasonable attorney's fee incident to the prosecution of the appeal is $500.

The judgment is reversed and the cause remanded with directions to the trial court to enter a judgment in favor of plaintiff and against the defendant in the amount of

$6,994.47 together with interest at the rate of six percent per annum from January 30, 1975; plus $1,700 as the attorney's fee; and the costs.

TITUS, P. J., and CAMPBELL and HENRY, Special Judges, concur.