## No. 16,378.

PARRISH ET AL. DOING BUSINESS AS FLORENCE MACHINERY
AND SUPPLY COMPANY *v.* HAINLEN.

(236 P.[2d] 115)

Decided September 17, 1951.

Messrs. Wood & Ris, Mr. Max P. Zall, for plaintiffs in error.

Messrs. Mabry, Mabry & Mabry, for defendants in error.

*En Banc.*

Mr. Justice Clark delivered the opinion of the court.

Defendants in error, who are related in blood as cousins, brought separate actions in the district court to recover damages for personal injuries sustained by each, resulting from an explosion of methane gas at a shaft house connected with the Bon Carbo coal mine located in Las Animas county and then in charge of plaintiffs in error. As the claims of both arose from the same occurrence with the pertinent facts identical, the cases were consolidated for trial and presently remain so joined. We will hereinafter refer to defendants in error as plaintiffs, and to plaintiffs in error as defendants.

Seeking to reverse the judgments of the trial court, entered in conformity with verdicts of the jury adverse to them, defendants bring the cases here by writ of error. The specification of points relate solely to matters of law and briefly stated are: That the trial court erred in failing to direct a verdict in favor of the defendants on plaintiffs' complaints for the reasons: (1) That plaintiffs failed to establish that they, or either

of them, sustained any damages as the proximate result of any negligence on the part of defendants; (2) that, under the undisputed evidence, the plaintiffs were guilty of contributory negligence; (3) that, under the undisputed evidence, the plaintiffs voluntarily assumed the risk involved; (4) that, under the undisputed evidence, plaintiffs were trespassers upon defendants' property and that defendants violated no duty owing by them to trespassers. A fifth specification concerns the refusal of the trial court to direct verdicts for the defendants on their counterclaims for the reasons that, from the undisputed evidence, as a matter of law, the damages sustained by defendants resulted solely and proximately from the negligence of plaintiffs.

Consideration of a motion for directed verdict, under elementary rule—needing no citation of authority—requires that the court shall review the evidence in the light most favorable to the party or parties against whom the motion is directed. With this fundamental principle in mind, we have made an exhaustive study of the record now before us. To the end that our conclusions may be understandable, we deem it advisable to set forth such of the salient facts of the case as are necessary for its decision.

In May, 1947, the Bon Carbo mine had reached that stage where all portions thereof, in so far as this matter is concerned, had become exhausted of its supply of available coal. At or about that time defendants bought the property and began salvage operations by dismantling and removal of the structures, machinery and equipment, both underground and upon the surface. Apparently the track and salvageable material were first removed from the underground workings. While this operation was going on, these old workings were sealed off by concrete partitions, or bulkheads, from that part of the mine where coal still was available, and which was then under lease to, and being productively operated by, one Cordoza.

The shaft, and premises with which we are here concerned, was not the main entrance to the mine but some distance therefrom. This shaft was somewhat over 300 feet deep, and at the mouth thereof was a shaft house, comprising two or more compartments, in which was located the various machines incidental to the operation of a hoist or cage in the shaft. At or about the middle of this general structure there was intruded what is referred to in the record as an air lock, which we take to be a separately enclosed room in which was contained a fan with its operative motor. The general over-all structure was constructed of nonflammable materials, being steel and concrete. The apartment referred to as the air lock, and which contained the fan, was upon a solid concrete foundation of at least twenty-four inches from the surface of the ground and probably as high as thirty inches. The main building was fitted with double doors on either side, both of which were padlocked at the time of the occurrence of events from which these actions arose. In addition to these openings was a single door into the air lock. This door, evidently intended only for the admission of employees during operations of the mine, ordinarily was kept secure by a bolt which required wrenches to remove and also a handle, or some separate implement, to raise the latch in order that the door might be opened even after the bolt had been removed.

The structure above described was located at a point about one-quarter mile distant from the county road. The lands were not enclosed, and on occasions livestock grazed near the shaft house. Persons also went upon the lands in that vicinity for the purpose of looking after livestock, hunting, gathering wood, or simply proceeding across the premises in order to reach some other place. Prior to November 18, 1947, all of the electric wires leading to the shaft house had been taken down, but the poles were left standing. The full complement of machines and equipment contained within the shaft

house and air lock were still there. No watchman, workman or employee of defendants was that day on the premises.

On said 18th day of November, 1947, the plaintiffs were returning to their homes, after delivering a truck load of slabs, and stopped their vehicle on the county road at a point about one-quarter mile away from said shaft house. They thereupon took a twenty-two caliber rifle from the truck and proceeded on a rabbit hunt. Going easterly up over the hill, they made a wide circle and when they came back around to the top of the hill on returning toward their truck, the shaft house stood in a direct line with the truck. It was a disagreeable, windy and rather cold day, and as they were about to pass the shaft house, they noticed that the door to the air look stood about halfway open, whereupon, as they both testified, they turned aside and entered this half-open door to get respite from the wind. Within a matter of seconds after their entry, the explosion occurred; almost immediately, as they testified, and as a result, both were quite seriously and painfully burned and otherwise injured. They state, and for the purpose of this decision it must be assumed that it is true, that they struck no match nor caused to be produced any flame of any kind.

The foregoing facts were in main presented by plaintiffs themselves, and such portions thereof as are not covered by their testimony are undisputed by them. It also is now conceded that there were cautionary signs posted both inside and outside of the building such as "Danger" and "No Smoking." Herbert admits that he saw a "no smoking" sign outside the building and another sign which, as he remembers, was "High Voltage, Danger." Leonard declares that he did not see any of these signs. It also is admitted that inside the air lock the light was very poor, perhaps almost a semi-darkness, not, however, to the extent but that objects therein could be distinguished without the aid of artificial light.

Both plaintiffs had lived in the general area of the Bon Carbo mine for most of their lives. They knew that the coal in that area contained gas, but had no special knowledge as to its extent or danger potentiality. Leonard some years before had worked as a topman at some of the mines thereabouts, but never had worked under ground. Herbert had had no coal mine experience. It also is admitted that to gain access to the air lock it was necessary to step up from the surface of the ground level to the threshold of the door through which plaintiffs entered said air lock, a distance of between twenty-four and thirty inches, as heretofore mentioned.

Counsel for plaintiffs, in their argument by brief filed in this court, confine the review to the single contention that defendants are liable because of their failure to comply with the provisions of section 97, chapter 110, '35 C.S.A. It is asserted that this statute is a proper police regulation, and that failure in compliance therewith on the part of defendants constitutes negligence per se; further, that because of defendants' original negligence in failing to do that which the statute required of them, they thereby placed in a position of danger the agency from which the injuries to plaintiffs immediately resulted, and which injuries would not have been incurred had there been a compliance with the requirements of the statute.

The statute, section 97, chapter 110, '35 C.S.A., upon which plaintiffs rely, is as follows: "The *owner operating* or *controlling coal lands* on which there are surface caves or *shafts of sufficient depth* to endanger the *lives of persons*, cattle, horses or other stock, *shall fence or fill* said caves, or shafts in such manner as to afford *permanent protection* to all persons and stock endangered thereby." We supply emphasis in the foregoing quoted statute to indicate the specific portions thereof applicable to the case here under consideration.

In the submitted briefs of counsel, respectively, arguments were presented relating to—as each contends—

the proper construction of the statute, and how and when it should be applied. In the present controversy these difficulties are obviated and rendered unnecessary of determination by the simple fact that even if construed in the manner for which plaintiffs contend, on the admitted and uncontroverted facts of this case, compliance therewith appears clear.

With serious doubts as to the correctness of plaintiffs' position, and without in anyway or manner being understood as approving the construction placed upon the statute by counsel in their behalf, in conformity with their presentation it should be assumed that one of the dangers to be protected against from an open shaft on coal lands is that of possible explosion of gas emanating therefrom. What, then, under the theory that this assumption be accurate, is the operating or controlling owner required under the statute to do? He is required to "fence or fill said caves or shafts in such manner as to afford permanent protection to all persons * * * "

In *Reino v. Montana Mineral Land Development Co.*, 38 Mont. 291, 99 Pac. 853, 855, the following definitions of the term "protect" were approved: "To guard; shield, preserve;" citing Webster's International Dictionary. "To cover or shield from danger, harm, damage, trespass, exposure, insult, temptation, or the like; defend; guard; preserve in safety. Synonyms: defend; shield; screen; secure;" citing Century Dictionary. "To cover, shield, or defend from injury, harm or danger of any kind." citing Encyclopedic Dictionary.

The word "permanent" relates to time. It means abiding and remaining fixed for such period as is necessary for the accomplishment of the objective in connection with which it is expressed. While it is an antonym of temporary, it does not necessarily imply perpetuity or mean forever. A permanent structure means a durable and substantial structure, reasonably adequate for

the purpose intended. 32 Words and Phrases, pp. 86, et seq.

■ It may easily be observed that the word "protection" may properly be applied in various situations, covering a broad field. It is to be interpreted in accordance with the objective sought to be accomplished, in conjunction with the prevailing facts and circumstances particularly present in each case. In certain instances, to afford protection, the term implies a structure of considerable resistive force, where it has been said that it must afford both a warning and at the same time strength sufficient to avoid going over or through it. Generally, however, where employed under circumstances such as are considered in this case, the word connotes, not so much the meaning of fortification, as it does notification; to warn and protect against injury persons who themselves employ reasonable precaution for their own safety; to put on guard. Therefore, "permanent protection," as used in the statute under consideration, and as applied to the facts of this case, means the erection about the mouth of an open shaft on coal lands, of a substantial structure or barricade, reasonably durable and adequately resistant to warn and guard away from danger persons who might innocently and without purpose wander upon the premises.

■ To "fence" means to erect a fence. Used as a noun a fence is an enclosing barrier about a field or other place, or about any object (here a mine shaft); especially, an enclosing structure of wood, iron or other material, intended to prevent intrusion from without or straying from within. *Midland Valley Railway Co. v. Bryant,* 37 Okla. 206, 131 Pac. 678. See, also, Webster's New International Dictionary. It frequently has been held that a fence is a building, the term "building" embracing all useful structures erected by man on land. *Mutual Lumber Co. v. Sheppard* (Texas), 173 S.W. (2d) 494, 499.

On the well-recognized principle that a general classi-

fication includes all component parts, and since it is conceded that the mine shaft with which we are here concerned had a well constructed building of concrete and steel erected over and wholly surrounding it, the conclusion is inevitable that said shaft was fenced. Around it was a continuous wall with a covering roof. Take off the roof, and if you so please, partially reduce the height of the walls all around, and there still would be a fence. The statute requires that the shaft be either fenced or filled. It was fenced; furthermore, the fence was substantial and entirely sufficient to afford "permanent protection" to persons on the premises who themselves were in the exercise of reasonable prudence in the interest of their own safety. There was full compliance with the statute.

How about the door to the air lock? This question now naturally presents itself. Under certain circumstances the partly opened door might have raised an issue sufficiently debatable that differences of opinion could have arisen among reasonable persons. For instance, had this structure been in the vicinity of a school ground where many children had access to it, or on a small tract or lot in a thickly populated area, a greater degree of precaution would undoubtedly have been required. Such is not the situation in this case. What may be termed reasonable protection under one set of circumstances might not be so regarded under another. In the instant case the structure was located in an isolated area and although there were occasional trespassers upon the surrounding premises, they were in no great numbers. It was situated a quarter mile from the county road; furthermore, these plaintiffs admit that they had no business to attend to at this shaft house, and that they had no invitation or even permission to enter. They presumably are men of at least ordinary intelligence. While they had no expert knowledge with respect to the nature of escaping methane gas, from the general knowledge of the community and

from their own personal past experiences, they were aware that coal deposits in that locality did contain such gas and that it was of a stealthy and dangerous nature. All of these things must be taken into consideration; but more important, we have here the admitted fact that in order to get themselves into this position of danger, these plaintiffs had to mount the top of the concrete foundation of this air lock, a perpendicular distance of from twenty-four to thirty inches, and enter through the half-open door into a semi-darkened area where visibility was not good. All the circumstances were such that certainly a clear warning to a reasonably prudent person cannot be gainsaid. The acts of plaintiffs in clambering up over this thirty-inch wall to the threshold of the half-open door into the air lock, poorly lighted, and wherein they knew lay danger, is comparable to the act of a man who would deliberately climb over a six foot woven wire fence enclosing a mine shaft outdoors and thus subject himself to injury. The owner is not an insurer, but is bound only to the exercise of such reasonable precaution as the surrounding conditions and circumstances may require.

The immediate cause of the injury to plaintiffs was the explosion of the methane gas; not the open door into the air lock. If this be considered as a concurring cause, then it is secondary in nature, and would impose liability on the one responsible therefor only when the consequences of its being left open could or should have reasonably been foreseen in the light of all surrounding circumstances. *Dixon v. Kentucky Utilities Co.,* 295 Ky. 32, 174 S.W. (2d) 19. There is no contention that the door was purposefully left open as an entrapment or inducement.

 ██ Having held that there was sufficient fence and barricade about the mine shaft to completely comply with the provisions and apparent intended purpose of the statute upon which plaintiffs rely, there can be no proper application of the doctrine of negligence per

se. Neither can there be doubt on the question of ordinary or common-law negligence in this case, for here plaintiffs were admittedly trespassers upon the lands of defendants. When they entered the premises at the boundary, they were what might be termed for lack of better words, technical trespassers, but when they climbed up over that twenty-four to thirty-inch concrete wall and entered through the half-open door into the air lock and building which itself covered and surrounded the mine shaft, they were actual and deliberate trespassers. Their situation under such circumstances has been many times covered by decisions of this court, of which we mention only the following: *Hayko v. Colorado & Utah Coal Co.*, 77 Colo. 143, 235 Pac. 373; *Gotch v. K. & B. Packing Co.*, 93 Colo. 276, 25 P. (2d) 719; *Esquibel v. Denver*, 112 Colo. 546, 151 P. (2d) 757.

By their last specification, defendants allege that the trial court committed error in refusing to direct verdicts in favor of defendants on their counterclaims. In respect to this matter the evidence is conflicting. On behalf of defendants it is asserted that the explosion of the methane gas could not have occurred had not one or both plaintiffs struck a light, or did some similar act to cause the gas to ignite. This is denied by plaintiffs. Furthermore, the witness Williams, a deputy mine inspector, testifying as an expert, and after stating the conditions necessary to concur to bring about the explosion of methane gas, definitely refused to state that the explosion from which these plaintiffs received their injuries was due to anything either of the plaintiffs had done. He stated that methane gas will not explode from spontaneous combustion; that certain conditions have to exist before it will explode, one being a flame or spark generating heat to the extent of 1208°F, and of a duration in excess of 3/5 of a second. Yet he said he did not know what caused this explosion. The verdicts of the jurors and the judgments of the trial court on these counterclaims therefore must be affirmed.

The judgments of the trial court are reversed on the plaintiffs complaints, and the cause remanded with instructions to vacate said judgments and dismiss the actions. On the defendants counterclaims the judgments of the trial court are affirmed.

Mr. Justice Moore not participating.