Marcedes MILLER, et al., Appellants,

v.

RIVER HILLS DEVELOPMENT,
et al., Respondents.

No. 59998.

Missouri Court of Appeals,
Eastern District,
Division Two.

May 19, 1992.

Motion for Rehearing and/or Transfer to
Supreme Court Denied
June 17, 1992.

Application to Transfer Denied
July 21, 1992.

Robert Gerard Kister, Dodson, Breeze & Kister, Festus, for appellants.

John H. Marshall, Burns, Marshall & Burns, Clayton, for River Hills Development Co.

David E. Larson, Kansas City, for Unimin Corp.

SIMON, Judge.

T.J. Whitmire (Whitmire), by and through his guardian and next friend, Marcedes Miller (Miller), appellants, appeal the trial court's grant of Respondents', Unimin Corporation (Unimin) and River Hills Development Company (River Hills), motions for summary judgment.

On appeal, appellants contend that the trial court erred in granting summary judgment in that 1) there is a genuine issue of material fact as to whether Unimin fulfilled its duty to adequately seal the mine as required by § 293.530(3) RSMo 1986 (all further references shall be to RSMo 1986 unless otherwise noted) and 2) there is a genuine issue of material fact as to whether River Hills knew or had reason to know that: a) a hazardous condition existed on its property; b) children were exposed to it; c) T.J. Whitmire did not know of and appreciate the danger; and d) it failed to prevent Whitmire from being exposed to such harm. We affirm in part and reverse in part.

■ Initially, we find that in light of the record presented an overview of summary judgment procedure is necessary. A motion for summary judgment may be made with or without supporting affidavits. Rule 74.04(a), (b). The motion shall be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Rule 74.04(c). When a motion for summary judgment is made, an adverse party "may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided in this Rule 74.04, shall set forth specific facts showing that there is a genuine issue for trial." Rule 74.04(e). When relying upon deposition testimony, interrogatory answers, or other documents, it is appropriate for both the moving and opposing parties to specifically direct the court to particular parts of the deposition transcript, interrogatory answer, admission or exhibit upon which the party is relying. *Landmark North County Bank & Trust Company v. National Cable Training Centers, Inc.*, 738 S.W.2d 886, 889[1, 2] (Mo.App.1987). This direction must be made part of the trial record as "[i]t is not the function of the appellate court to sift through material furnished by the parties on appeal to determine the exact nature of the evidentiary material submitted to the trial court in a summary judgment proceeding." *Id.* quoting *Hill v. Air Shields, Inc.*, 721 S.W.2d 112, 116 (Mo.App.1986). Unless the record on appeal demonstrates that the documents purportedly relied upon in the trial court were properly made part of the trial record, we cannot say that they were considered by the trial court and they may not be considered on appeal. *Id.*

■ Here, the record on appeal consists of a transcript of the hearing and a legal file with six supplements (appellants filed three, Unimin filed two and River Hills

filed one) and numerous exhibits. Of the ten depositions submitted, only the deposition of John Price has been signed and certified, the depositions of Thomas J. Whitmire and Ernie Hastings lack page numbers, the depositions of Thomas A. Herrmann and Patrolman Allen McKenzie were transcribed after the summary judgment motions had been granted, and the depositions of George Green, Arthur Smith, Ph.D., Edwin D. Wolfgram, M.D., and Marcedes Miller were not mentioned in any of the motions filed with the trial court. Also submitted was the deposition of George Nathan Hall. Appellants filed a motion to supplement the legal file with certain depositions. River Hills objects to appellants' attempt to supplement the record with any deposition or part of a deposition that was not cited to the trial court in documentation supporting or opposing summary judgment. Unimin objects to appellants' attempt to supplement the record with the depositions as they were not part of the record presented to the trial court. Although Unimin seeks to keep these depositions out of the record, Unimin cited portions of T.J. Whitmire's and John Price's depositions to the trial court in its memorandum supporting its motion for summary judgment. After carefully reviewing the record, we deny appellants' request to supplement the legal file with depositions or portions of depositions not cited to the trial court for resolution of the summary judgment motion, i.e., the depositions of Edwin D. Wolfgram, M.D., Thomas A. Herrmann, Patrolman Allen McKenzie, George Green, Arthur Smith, Ph.D. and Marcedes Miller. Additionally, the photographic exhibits which are connected to the deposition of Patrolman Allen McKenzie were not before the trial court and are not before us.

With respect to other portions of the record on appeal, we note that appellants failed to specifically direct the trial court to the portions of the depositions relied on. We have expended an abnormal amount of time trying to piece together the record on which the trial court reached its decision.

Viewing the record in a light most favorable to Whitmire and Miller the facts are as follows. On June 5, 1989, Whitmire, age fourte, fell into a vertical ventilation shaft at an abandoned sandmine near Crystal City, Missouri. Unimin operated the mine from October 31, 1972 to its cessation of operations on January 21, 1983. Following cessation of mining operations Unimin took steps to seal the openings to the mine and prevent trespassing on the property. Unimin sold the property to River Hills on May 30, 1989, executing a quit-claim deed and special warranty deed to memorialize the sale. On June 4, 1989, Whitmire and his cousin, Ernie Hastings (Hastings), age fifteen, went to the mine site to explore. They found an entrance into the mine and followed that path which led to a steep dropoff and thus did not travel further on that route. On June 5, 1989, Whitmire and Hastings decided to go to the mine area again to find a better way to get into the mine, and discovered a hole, later determined to be a vertical mine shaft, which was surrounded by a chain link fence. A "Danger" sign was attached to one side of the fence surrounding the opening to the vertical mine shaft. From outside the fence, all that could be seen was a hole or depression in the ground of unknown depth. Whitmire crawled under the fence to take a closer look at the hole. The ground surrounding the hole was loose and gave way causing him to fall over 60 feet into the mine shaft sustaining serious injuries.

Appellants filed an amended six count petition essentially alleging that: River Hills negligently failed to adequately seal or fence the mine openings as required by § 293.530 and 30 U.S.C. § 811 et seq. and that Whitmire, because of his youth, did not appreciate the risk of harm (Count I); Unimin, Martin–Marietta Corporation, and PPG Industries, Inc. negligently failed to adequately seal or fence the mine openings as required by § 293.530 and 30 U.S.C. § 811 et seq. and failed to adequately fence, barricade, seal off, or warn of the dangerous conditions upon its property (Counts II, III, and IV respectively); Miller has been damaged as a direct and proximate result of the negligence of Defendants and resulting injuries to her son

Whitmire (Count V); and George Green, plant manager of the Unimin Mine and Mill operations, negligently failed to adequately seal or fence the mine openings as required by § 293.530 and 30 U.S.C. § 811 et seq. and failed to adequately fence, baricade, seal off or warn of the dangerous conditions upon the property known as "PPG Sandmine". This appeal involves only Unimin's and River Hills' summary judgments.

Appellants, in their first point on appeal, contend that the trial court erred in granting summary judgment because there is a genuine issue of material fact, i.e. did Unimin, even though it sold the property to River Hills six days prior to the accident, fulfill its duty to adequately seal the mine as required by § 293.530(3). Section 293.-530(3) provides:

> 293.530. Notice of opening and abandonment of mines—abandoned mines to be sealed
>
> 1. ...
>
> 2. ...
>
> 3. Upon abandonment of any underground mine, the operator of that mine shall seal or fence the surface openings of the mine in such a manner as to afford permanent protection to all persons and animals.

The thrust of appellants' action is that although Unimin did not own the property at the time of the accident, it still had an affirmative duty to adequately seal or fence the surface opening of the mine so as to afford permanent protection to all persons and animals upon abandonment of the mine as proscribed by § 293.530.

Unimin argues that it is not bound by the statute because it did not own the mine at the time of the accident and § 293.530 does not create an ongoing duty of care. Further, Unimin argues that assuming it did come under the statutory guidelines, it complied with the statute and relies on *Parrish v. Hainlen*, 124 Colo. 229, 236 P.2d 115 (1951). In *Parrish* two adult men were injured from an explosion of coal gas at a shaft house connected with a mine. *Id.* The plaintiffs argued that defendants were liable because they failed to comply with the provisions of section 97, chapter 110,-'35 C.S.A. *Id.*, which provides:

> The owner operating or controlling coal lands on which there are surface caves or shafts of sufficient depth to endanger the lives of persons, cattle, horses or other stock, shall fence or fill said caves or shafts in such manner as to afford permanent protection to all persons and stock endangered thereby.

The court in *Parrish* interpreting "protection" stated that *"where employed under circumstances such as are considered in this case*, the word connotes not so much the meaning of fortification, as it does notification...."* (emphasis added) *Id.* at 119. The court went on to state that,

> "... 'permanent protection', as used in the statute under consideration, and *as applied to the facts of this case*, means the erection about the mouth of an open shaft on coal lands, of a substantial structure or barricade, reasonably durable and adequately resistant to warn and guard away from danger persons who might innocently and without purpose wander upon the premises." (emphasis added).

*Id.* Unimin argues, relying on *Parrish's* interpretation of the word "protection", that it complied with its statutory duty. In support of its argument, Unimin directed the trial court to: 1) a report by Earl Wilson, a mine inspector for the United States Mine Safety and Health Administration, describing the baricades and fences surrounding the abandoned mine which states, "I (sic) appears that all reasonable precautions were taken by [Unimin] to discourage trespassing;" and 2) a state mine inspector's report dated August 17, 22, 1988 stating, "Inspection of old mine opening, which is sealed off and the rest is fenced to keep people out of old mine area."

Appellants directed the trial court's attention to Whitmire's and Hasting's depositions wherein they testified that there was a gap between the ground and the fence surrounding the air shaft and they went underneath the fence. Appellants also directed the trial court's attention to portions

of the deposition of George Nathan Hall, a former Unimin employee, wherein Mr. Hall testified that he assumed outside people were getting in the mine area because there was evidence of fires, beer cans and graffiti.

■ Here, the primary focus is the meaning of the words "permanent protection" as used in § 293.530. "When examining for the meaning of statutory enactments, our primary role is to ascertain the intent of the legislature from the language used and give effect to that intent if possible." *Trailiner Corporation v. Director of Revenue,* 783 S.W.2d 917, 920[1–4] (Mo. banc 1990). In so doing the words of the statute are to be given their plain and ordinary meaning. *Id.* Further, when the language of the statute is clear and unambiguous there is no room for construction. *Community Federal Savings & Loan Association v. Director of Revenue,* 752 S.W.2d 794, 798[6] (Mo. banc), cert. denied, 488 U.S. 893, 109 S.Ct. 231, 102 L.Ed.2d 221 (1988).

Our analysis of *Parrish* indicates that the Colorado Supreme Court clearly limited its interpretation of its statute to the specific circumstances of that case. There the injured parties were adults, grew up in the community, were aware that the coal contained a gas of a dangerous nature, and purposely mounted a concrete foundation to enter a semi darkened area of an air lock.

■ Here, the language of § 293.530(3) is clear and unambiguous. It is true that generally, under the common law, a vendor of land is not liable for physical harm caused to others while upon the land after the vendee has taken possession by any dangerous condition which existed at the time vendee took possession. Restatement 2nd of Torts § 352. Here, however, the statute directs itself to the duty of the operator at the time of abandonment. The language of the statute does not distinguish between the present operator and the previous operator of the mine nor does it indicate that the duty established is ongoing once the property has been sold. Unimin was the owner and operator of the mine for approximately eleven years. It abandoned use of the mine on January 21, 1983 and sold the mine to River Hills on May 30, 1989. Unimin, upon abandonment of the mine, was required to seal or fence the surface openings of the mine so as to afford permanent protection to all persons and animals. Warning signs were posted, barricades and fences were set up, and a fence was erected around the surface opening where Whitmire fell. Clearly the statute, giving the words their plain and ordinary meaning, means more than just notification under the circumstances of this case. There is a dispute as to the material fact of whether the fence surrounding the air shaft provided permanent protection in accordance with the statute. This is a material fact because the adequacy of the fencing is crucial in determining whether Unimin complied with its statutory duty. Summary judgment was improperly granted with respect to Unimin.

In their second point, appellants contend that the trial court erred in granting summary judgment to River Hills because there is a genuine issue of material fact as to whether: 1) River Hills knew or had reason to know that a hazardous condition existed on its property and that children were exposed to it; 2) Whitmire knew of and appreciated the danger; and 3) River Hills failed to prevent Whitmire from being exposed to such harm. Appellants' claim is based on the attractive nuisance doctrine.

River Hills argues that appellants may not recover under the theory of attractive nuisance because the condition of its property presented such an open and obvious danger and Whitmire was of sufficient age to appreciate such danger. River Hills directed the trial court to portions of Whitmire's deposition stating that 1) he passed warning signs, a fence gate, a steel barricade across a bridge, and a chain fence before reaching the air shaft where the injury occurred; 2) he passed a sign saying No Trespassing and that he understood that this sign applied to him and it meant "stay away"; and 3) he and his cousin had been to the mine area the day before the accident occurred and found a way into the

mine by pulling back a piece of tin covering a hole leading to a large drop off and realized at that time that he could risk some injury to himself if he did attempt to jump down that shaft. Additionally, he stated that he wasn't sure whether his mother or his cousin Ernie's mother had told them not to go there but in any event they were told to be careful. Further testimony by Whitmire is as follows:

Q. After having been to that mine on the prior visit, specifically the day before, you knew that if you weren't careful there were ways that you could injure yourself on the property; didn't you?

A. I'm sure we knew.

Q. And it's also true that you and Ernie knew from that first visit that because you could get hurt if you weren't careful that was one of the reasons why the owners didn't want you on that abandoned property?

A. Yes.

.    .    .    .    .

Q. Tell us in your own words then what you and Ernie did when you discovered this area with the fence around it?

A. Well, we walked, we went over to it and we noticed that it went downward, but you couldn't really see if it dropped off or not, and we went underneath the fence. It was a fairly wide gap underneath of it and we just went underneath of it and we were standing there.

Q. Okay. I'll ask you some other questions in a minute, but when you were on the outside of the fence looking in were there any signs that were connected to the fence at all?

A. Yes.

Q. Do you recall how many signs there were?

A. There was a sign on the fence. I'm not sure how many there were. I'm not real sure what it said either.

Q. Although you can't recall specifically the words on that sign do you recall it being something to the effect of a warning or keep out or something of that variety of sign?

A. Yes.

.    .    .    .    .

Q. Now, you understood that the fence and the sign were there as a warning to you not to go inside of the area of that fence; right?

A. Yes, I'm sure we understood at the time.

Q. But in spite of the fence and the warning you and Ernie disregarded those things and decided to go in?

A. Yes.

Q. Right?

A. Yes.

Q. And you and Ernie both knew that you didn't want to get too close to that hole because you could get hurt; right?

A. Right.

.    .    .    .    .

Q. You understood that by going under this fence you were getting into an area that the owners of the property didn't want you; right?

A. Yes.

.    .    .    .    .

Q. And wouldn't it be a true statement then that because of how the fence was situated with the hole there that you knew that the fence was to keep you away from that hole?

(Objection made; Reporter read back pending question)

A. Yes.

Additionally, River Hills directed the trial court's attention to an affidavit of J. Price, an officer of River Hills, to which photographs of the numerous warning signs, barricades, and barriers are attached.

Since appellants have failed to submit affidavits or to direct us to any portion of the record disputing the facts set forth by River Hills they are deemed admitted. *Smithey v. Davis,* 752 S.W.2d 486, 489[4–7] (Mo.App.1988).

Section 339 Restatement of Torts (First), a modified attractive nuisance doctrine, was applied by our Supreme Court in *Arbogast v. Terminal Railroad Association of*

*St. Louis,* 452 S.W.2d 81, 84[9] (Mo.1970). Later in *Glastris v. Union Electric Company,* 542 S.W.2d 65 (Mo.App.1976), it was found that the 1965 revision (Restatement of Torts 2d) of § 339 Restatement of Torts (First) did not produce any material changes. Section 339 Restatement of Torts 2d provides:

§ 339. Artificial Conditions Highly Dangerous to Trespassing Children

A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if

(a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and

(b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and

(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and

(d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and

(e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children.

■ Attractive nuisance liability exists only with respect to dangerous conditions or structures where the danger is not open and obvious to the injured party. *Pitts v. Fred Weber Contractor, Inc.,* 466 S.W.2d 124, 127[4] (Mo.App.1971). A condition known to be dangerous to an adult is not necessarily held to be dangerous to a child due to lack of maturity. *Id.* The duty of the possessor of the land "does not extend to those conditions the existence of which is obvious even to children and the risk of which should be fully realized by them." *Id.* See also § 339 Restatement of Torts

2d, Comment i, p. 202. As a child gets older, conditions become fewer for which there can be recovery under § 339, until at some indeterminate point, probably beyond the age of sixteen, there are no longer any such conditions. Comment c, § 339 Restatement of Torts 2d, p. 199.

We have found that certain situations have been exempted from the ambit of § 339. The reasoning for this is set forth in Prosser, Law of Torts, 5th Edition, Ch. 10, § 59, pp. 406–407:

One very important factor is that of whether the trespassing child may reasonably be expected to comprehend the situation. Sometimes this is expressed by saying that the danger must be latent, meaning apparently nothing more than that the child can be expected not to perceive or appreciate the peril. The question here is not whether he does in fact understand, although that too has its importance; it is rather what the possessor may reasonably expect of him. Here the courts have displayed a tendency to set up certain more or less arbitrary categories of conditions which trespassing children, as a matter of law, can be expected to understand. This means that the possessor is free to rely upon the assumption that any child of sufficient age to be allowed at large by his parents, and so to be at all likely to trespass, will appreciate the danger and avoid it, or at least make his own intelligent and responsible choice. The danger to which such a fixed rule most often has been applied is that of drowning in water; but there are numerous cases showing a similar rigidity as to the perils of fire, falling from a height or into an excavation, moving vehicles, ordinary visible machinery in motion, the natural propensities of a horse, sliding or caving soil, and piles of lumber, crossties, and other building material.

This rationale has been applied in such cases as *Finn v. Newsam,* 709 S.W.2d 889 (Mo.App.1986), and *Henderson v. Terminal Railroad Association of St. Louis,* 659 S.W.2d 227 (Mo.App.1983). In *Finn* a seven year old boy fell into an ice covered

pond and drowned. 709 S.W.2d at 890. The court held that the pond constituted an open and obvious danger which a child old enough to roam at large should have comprehended. *Id.* at 892. In *Henderson* an eleven year old child, functioning mentally at a five to six year old level, was injured while hopping on and off a moving train. 659 S.W.2d at 229. This court held that applying the rationale as stated in Prosser that the appellants failed to make a submissible case under § 339 as a matter of law.

Here, since the air shaft did not present an open and obvious danger we must determine if River Hills, by its motion for summary judgment, eliminated an element of appellants' attractive nuisance claim. In determining whether a child "discovers the condition or realize[s] the risk involved" consideration must be given to the factors of age, intelligence, maturity, and capacity. *Lister v. Campbell,* 371 So.2d 133, 135[8, 9] (Fla. 1st DCA 1979). See also *Baucom v. City of North Little Rock,* 249 Ark. 848, 462 S.W.2d 229, 231[2] (1971), ("... the factors of age, intelligence, and experience should be considered in any given case to determine if that particular minor acted as a reasonably careful child of the same age and intelligence would have acted.") The most obvious of these factors is age. "What might constitute an attractive nuisance to a seven year old child would be immaterial as applied to a fourteen year old high school student." *O'Keefe v. South End Rowing Club,* 64 Cal.2d 729, 51 Cal. Rptr. 534, 543, 414 P.2d 830, 839[13] (1966). Further, when determining a child's realization of risk, "[o]ften the child's own testimony is the best evidence of whether he possessed sufficient intelligence and knowledge to understand or avoid the danger." *Lister v. Campbell* at 136[8, 9].

Here, Whitmire was fourteen years of age. Appellants have failed to direct us to any portion of the record indicating that Whitmire was of lower intelligence or mental capacity than an average fourteen year old. Whitmire's deposition testimony indicates that he was familiar with the area, was aware of the dangers associated with the mine openings, understood that he was trespassing, and understood that he could get hurt.

In negligence cases, summary judgment is generally not as feasible as in other types of cases. *Hill v. Air Shields,* 721 S.W.2d 112, 115 (Mo.App.1986). Here, however, based on the record it is clear that Whitmire knew and appreciated the danger involved in exploring the abandoned mine area and we find no indication in the record disputing this fact. As part of their burden of proof appellants had to establish that Whitmire because of his youth did not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it. Since River Hills' motion clearly established that Whitmire did appreciate the danger summary judgment was properly granted.

Judgment affirmed in part and reversed in part.

GRIMM, P.J., and CRANDALL, J., concur.