SOUTHWEST BANK OF POLK
COUNTY, Appellant,

v.

Virgil D. HUGHES, Karen F. Hughes,
Edward J. Cahoj and Virginia
Cahoj, Respondents.

No. 19137.

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 8, 1994.

Motion for Rehearing or Transfer to
Supreme Court Denied Sept. 13, 1994.

Monte P. Clithero, Kevin M. FitzGerald, Taylor, Stafford, Woody, Clithero & FitzGerald, Springfield, for appellant.

Peter H. Rea, Branson, for respondents Virgil D. Hughes and Karen F. Hughes.

Charles B. Cowherd, Mark D. Pfeiffer, Farrington & Curtis, Springfield, for respondents Edward J. Cahoj and Virginia Cahoj.

CROW, Judge.

On May 11, 1992, Plaintiff, Southwest Bank of Polk County, filed suit against four defendants: Virgil D. Hughes, Karen F. Hughes, Edward J. Cahoj and Virginia Cahoj. Plaintiff's petition alleged the quartet fraudulently obtained a tract of land from Plaintiff by means of two deeds dated February 25, 1986.

By a motion to dismiss and a motion for summary judgment, Defendants Cahoj asserted the cause of action was barred by § 516.120, RSMo 1986, the five-year statute of limitation. Defendants Hughes, by a separate motion, "adopted" the motion for summary judgment filed by Defendants Cahoj.[1]

Plaintiff conceded in the trial court that the five-year limitation applied. However, Plaintiff's petition averred Plaintiff acquired no knowledge of the fraud until April, 1992. That is significant because of paragraph "(5)" of § 516.120, which reads:

> "An action for relief on the ground of fraud, the cause of action in such case to be deemed not to have accrued until the discovery by the aggrieved party, at any time within ten years, of the facts constituting the fraud."

In *Berry v. Dagley,* 484 S.W.2d 182, 184[2] (Mo.1972), the court addressed the above provision, explaining:

> "A maximum of ten years is given for the discovery of the fraud and suit must be filed within five years after the discovery of the fraud or, in any event, within fifteen years after the commission of the fraud."

Defendants did not dispute that proposition of law in the trial court. However, Defendants maintained one of Plaintiff's employees, Ronald P. "Mike" Kelley ("Kelley") knew about the alleged fraud in 1986, and his knowledge was imputed to Plaintiff. Therefore, argued Defendants, the five-year limitation began running then and expired before Plaintiff filed suit.

The trial court found Kelley acquired knowledge of the alleged fraud in 1986. The trial court imputed that knowledge to Plaintiff. Accordingly, the trial court held Plaintiff's cause of action was barred by § 516.120, and entered judgment for all Defendants.[2] Plaintiff appeals.

The sole issue on appeal is whether the trial court erred in holding the cause of action was barred by limitation because of Kelley's knowledge. A synopsis of Plaintiff's petition is helpful in resolving that issue.

Plaintiff's petition alleged: (A) Plaintiff is the successor by merger to Humansville Bank; (B) Virgil D. Hughes ("Virgil") was president of Humansville Bank from 1986 until April 6, 1989, and thereafter was an officer of Plaintiff until his employment was terminated in 1991; (C) during his employment, Virgil was a director of Humansville Bank and, after the merger, a director of Plaintiff; (D) Virgil, as president of Humansville Bank, caused a tract of land owned by it in Taney County—"the Woods property"—to be conveyed to Defendants Cahoj by warran-

---

1. At the time the motions were filed, the suit was pending on Plaintiff's first amended petition. Defendants Hughes had filed an answer which did not raise the statute of limitation defense. In this appeal, Plaintiff does not dispute the right of any defendant to assert that defense. Consequently, we do not address the subject; however, anyone interested in it can examine *Reed v. Rope,* 817 S.W.2d 503, 507 (Mo.App.W.D.1991).

2. Plaintiff's first amended petition contained four counts. As explained more fully *infra,* the first three counts were based on the February 25, 1986, deeds. The fourth count sought recovery from Virgil D. Hughes, alone, on a claim unrelated to the first three counts. The trial court did not dispose of the fourth count; however, the trial court found there was no just reason for delay in adjudicating the first three. Rule 74.-01(b), Missouri Rules of Civil Procedure (1993).

ty deed dated February 25, 1986; (E) on the same date, Defendants Cahoj executed a warranty deed conveying an undivided half interest in the Woods property to Virgil and his wife, Karen F. Hughes ("Karen"); (F) the board of directors of Humansville Bank did not authorize Virgil to acquire an interest in the Woods property; (G) the consideration received by Humansville Bank for the Woods property was inadequate or, alternatively, the transaction represented an economic opportunity which Virgil, as fiduciary, had no right to usurp; (H) Virgil's acquisition of an interest in the Woods property was "constructively fraudulent and void" as to Humansville Bank; (I) Karen knew or should have known that her and Virgil's acquisition of a half interest in the Woods property violated Virgil's fiduciary duty to Humansville Bank; (J) Defendants Cahoj acted in concert with Virgil in acquiring the Woods property, knowing Virgil was not authorized to obtain an interest in it, thereby committing "constructive fraud" on the bank.

As noted earlier,[3] three counts of Plaintiff's petition were devoted to the alleged fraud. Count I sought sundry relief against Defendants Hughes, including a constructive trust on their half interest in the Woods property, an order commanding them to deed their interest to Plaintiff or, alternatively, a money judgment. Count II sought similar relief against Defendants Cahoj. Count III sought punitive damages from all Defendants.

The standard of appellate review is found in *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371 (Mo. banc 1993):

"When considering appeals from summary judgments, the Court will review the record in the light most favorable to the party against whom judgment was entered. *Zafft v. Eli Lilly,* 676 S.W.2d 241, 244 (Mo. banc 1984); *Cooper v. Finke,* 376 S.W.2d 225, 228 (Mo.1964). Facts set forth by affidavit or otherwise in support of a party's motion are taken as true unless contradicted by the non-moving party's response to the summary judgment motion. *Cherry v. City of Hayti Heights,* 563 S.W.2d 72, 75 (Mo. banc 1978); *Diet-*

*rich v. Pulitzer Publishing Company,* 422 S.W.2d 330, 333 (Mo.1986). We accord the non-movant the benefit of all reasonable inferences from the record. *Martin v. City of Washington,* 848 S.W.2d 487, 489 (Mo. banc 1993); *Madden v. C & K Barbeque Carryout, Inc.,* 758 S.W.2d 59, 61 (Mo. banc 1988).

Our review is essentially *de novo.* The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of sustaining the motion initially. *E.O. Dorsch Electric Co. v. Plaza Const. Co.,* 413 S.W.2d 167, 169 (Mo.1967). The propriety of summary judgment is purely an issue of law. As the trial court's judgment is founded on the record submitted and the law, an appellate court need not defer to the trial court's order granting summary judgment. *Elliott v. Harris,* 423 S.W.2d 831, 834 (Mo. banc 1968); *Swink v. Swink,* 367 S.W.2d 575, 578 (Mo.1963)."

*ITT Commercial Finance,* 854 S.W.2d at 376[1–6].

■ The parties have presented us a massive (936–page) legal file. Their briefs direct us to multitudinous pages, including segments of deposition testimony, answers to interrogatories, and affidavits.

The Eastern District of this Court was confronted by similar circumstances in *Miller v. River Hills Development Co.,* 831 S.W.2d 756, 757–58 (Mo.App.E.D.1992). It held:

"When relying upon deposition testimony, interrogatory answers, or other documents, it is appropriate for both the moving and opposing parties to specifically direct the [trial] court to particular parts of the deposition transcript, interrogatory answer, admission or exhibit upon which the party is relying. *Landmark North County Bank & Trust Company v. National Cable Training Centers, Inc.,* 738 S.W.2d 886, 889[1, 2] (Mo.App.1987). This direction must be made part of the trial record as '[i]t is not the function of the appellate court to sift through material

---

**3.** Footnote 2, *supra.*

furnished by the parties on appeal to determine the exact nature of the evidentiary material submitted to the trial court in a summary judgment proceeding.' *Id.* quoting *Hill v. Air Shields, Inc.*, 721 S.W.2d 112, 116 (Mo.App.1986). Unless the record on appeal demonstrates that the documents purportedly relied upon in the trial court were properly made part of the trial record, we cannot say that they were considered by the trial court and they may not be considered on appeal. *Id.*"

*Miller*, 831 S.W.2d at 757[3].

Consistent with *Miller*, we have undertaken to ascertain, as best we can, what the parties presented to the trial court in support of, and in opposition to, summary judgment.[4]

Defendants Cahojs' motion to dismiss, mentioned in the second paragraph of this opinion, appears at page 356 of the legal file. It did not cite any part of the record to the trial court. Defendants Cahojs' motion for summary judgment, also mentioned in the second paragraph of this opinion, appears at page 764 of the legal file. It cited the trial court to (a) "Plaintiff's supplemental interrogatories, filed on or about July 15, 1993," and (b) "original deposition transcript testimony of Ronald P. 'Mike' Kelley."

We have searched the legal file and have been unable to find any "supplemental interrogatories" filed by Plaintiff on or about July 15, 1993. We discovered, and scrutinized, a letter from Plaintiff's lawyer to the circuit clerk dated November 16, 1993, ordering the legal file. In the letter, we espied no mention of any supplemental interrogatories filed on or about July 15, 1993.[5]

The legal file does contain a copy of a 103-page deposition of Kelley taken August 6, 1993. We assume that is the deposition referred to by Defendants Cahoj in the motion for summary judgment. Said motion does not direct the trial court to any particular page or line of the deposition.

At pages 787–801 of the legal file we discovered fifteen pages of written suggestions filed in the trial court by Defendants Cahoj in support of the statute of limitation defense. Those suggestions contain references to specific pages and lines of the Kelley deposition mentioned in the preceding paragraph. We assume the trial court considered those passages in entering summary judgment. Borrowing the term "trial record" from the final sentence of the *Miller* excerpt (quoted *supra*), we shall treat the identified passages of the Kelley deposition as part of the trial record.

Defendants Cahojs' suggestions also referred the trial court to "interrogatories that were filed on or about December 17, 1992." Our examination of the legal file leads us to conclude Defendants Cahoj were attempting to direct the trial court to a twelve-page document designated "Plaintiff's Answers to Defendant's Supplemental Interrogatories" filed in the trial court December 18, 1992. The document comprises interrogatories and answers numbered 1 through 39. Cahojs' suggestions did not direct the trial court to any specific answer or answers. However, inasmuch as the interrogatories and answers occupy only ten of the twelve pages of the document, we shall, with some trepidation, treat the document, in its entirety, as part of the trial record.

Our probe of the legal file uncovered nothing submitted to the trial court by Defendants Hughes in support of the statute of limitation defense except a letter from their lawyer dated September 13, 1993. It contains amusing hyperbole and a reference to Abraham Lincoln, but no citation of any particular part of any specific document.

---

4. The motion for summary judgment was presented to the trial court on September 7, 1993, and was granted October 6, 1993. We wistfully observe that by reason of the changes in Rule 74.04 which took effect January 1, 1994, our task would have been considerably easier had the motion been presented after the latter date. *See:* Rule 74.04(c), Missouri Rules of Civil Procedure (1994).

5. In our exploration of the legal file, we came across a four-page document designated "Plaintiff's Amended Answers to Certain of Defendants Hughes' Supplemental Interrogatories." It was filed in the trial court July 23, 1993. We suspect it may be the document to which Defendants Cahoj meant to refer. However, we are too uncertain about our suspicion to rely on it.

Finally, we found in the legal file sixteen pages of written suggestions filed in the trial court by Plaintiff in opposition to the statute of limitation defense. Those suggestions began by inviting the trial court "to read the entire deposition of ... Kelley." Applying *Miller,* we decline to treat Kelley's 103–page deposition, in its entirety, as part of the trial record.

However, Plaintiff's suggestions later referred the trial court to specific pages of Kelley's deposition. We shall treat those pages as part of the trial record.

Plaintiff's suggestions also directed the trial court to two specifically identified interrogatory answers, which we shall consider part of the trial record. Additionally, Plaintiff's suggestions cited the trial court to a four-page affidavit of Kelley dated September 1, 1993. We treat it as part of the trial record.

We believe we have now identified all components of the trial record. We shall therefore endeavor to extract from those sources all facts as to which there is no genuine issue and which are material to the statute of limitation defense. *ITT Commercial Finance,* 854 S.W.2d at 381[16].

■■■ The materiality of the facts is illustrated by some familiar rules of law.

"A corporation can obtain knowledge only through its officers or agents and it is a well-established rule of agency that the knowledge of an agent of a corporation with reference to a matter within its scope of his authority and employment and to which his authority or employment extends is imputed to the corporation."

*Packard Mfg. Co. v. Indiana Lumbermens Mut. Ins. Co.,* 356 Mo. 687, 203 S.W.2d 415, 421[7] (banc 1947).

"... knowledge of ... an agent while acting within the scope of authority and with regard to any business over which his authority reaches, is notice to, or knowledge of, the principal."

*Eveready Heating & Sheet Metal, Inc. v. D.H. Overmyer, Inc.,* 476 S.W.2d 153, 155[4] (Mo.App.1972).

From the trial record, we learn Kelley became an employee of Humansville Bank on August 24, 1984. At that time, Virgil was president. In 1985, Virgil appointed Kelley a "loan officer" with authority to "make small consumer installment loans with limits of somewhere between $1,000 and $2,500."

By 1986, Kelley's responsibilities had grown to include preparation, by computer printout, of a list of "other real estate" owned by the bank. This list, referred to as the "ORE list," was given by Kelley to Virgil and placed in a "board packet" furnished to each member of the bank's board of directors. ORE lists were attached to minutes of board meetings. Kelley described the procedure in his affidavit of September 1, 1993:

"I would make a computer list showing the other real estate held by the bank, and if Virgil told me that the bank had acquired additional other real estate, I would place it on the list, or if he told me that other real estate contained on the list was no longer held by the bank, I would either delete it from the list or line through it.

I do not recall being familiar with the bank policies as to other real estate in 1986[,] ... nor do I now know what the policies were in 1986, of my own knowledge. At some point in time, I began attending board meetings, but I cannot remember the Board asking me anything about other real estate transactions back in the time period of 1986. During ... 1986, it was not within my job duties for the bank to be involved in obtaining other real estate for the bank or disposing of other real estate which was held by the bank. I simply kept a list as directed by Virgil...."

In 1986, Virgil was authorized to sell land on the ORE list, "subject to state and federal regulations, the laws of the state of Missouri and provided there was full disclosure [to the board of directors] of all details of the sale."

The bank obtained the Woods property by "deed ... taken in lieu of foreclosure." It was placed on the ORE list sometime before February 25, 1986.

Kelley was a notary public in 1986. He notarized Virgil's signature on the warranty

deed referred to in clause "(D)" of the paragraph in this opinion, *supra*, synopsizing the allegations of Plaintiff's petition. Kelley also notarized the Cahojs' signatures on the warranty deed referred to in clause "(E)" of the paragraph mentioned in the preceding sentence. Although the deeds are dated February 25, 1986, the acknowledgements are dated April 26, 1986.

Kelley avowed he did not know on February 25, 1986, that the Woods property had been sold to the Cahojs and the Hugheses. However, a line was marked through the Woods property on the ORE list at the March 14, 1986, board meeting.

During his August 6, 1993, deposition, Kelley testified he learned, either from Virgil or from Edward Cahoj, that the Woods property had been sold to the Cahojs. That is how Kelley knew to "mark it off the [ORE] list." However, Kelley stated in his affidavit of September 1, 1993:

> "I do not recall that at the time [the Woods property] was deleted from the list, Virgil ... told me anything about who had purchased the property or why it was being deleted from the list.
>
> It is obvious, looking back at the deeds ... that I notarized the signatures on both the deed from the bank to the Cahojs and from the Cahojs to Virgil ... and his wife, however, at the time that I notarized the deeds, I did not read the deeds, and I did not obtain knowledge, to my recollection, through notarizing the deeds that the Woods property was being sold to the Cahojs who were then transferring half interest to the Hughes."

In another part of the above affidavit, Kelley admitted he learned, sometime in 1986, that the Woods property had not only been conveyed to the Cahojs, but also that they had transferred a half interest to the Hugheses. Kelley learned this by overhearing conversations between Edward Cahoj and Virgil in Kelley's office.

In 1986, Virgil, Barbara Hensley and Kelley were "the highest ranking people at the bank." They discussed bank activities "on a daily basis." Viewed in the light most favorable to Plaintiff, *ITT Commercial Finance,*

854 S.W.2d at 376[1], the trial record demonstrates Kelley ranked lowest among the trio. Possibly, there were occasions in 1986 when Virgil and Barbara were gone, leaving Kelley as the highest ranking person present. Kelley became a member of the board of directors in 1987.

The parties, in their respective briefs, present statements of fact in addition to those narrated above. Although the sources cited in support of those facts appear in the legal file, the briefs do not demonstrate that those sources were cited to the trial court. Consequently, we do not consider such facts as part of the trial record. *Miller,* 831 S.W.2d at 757.

In confining our review to the trial record, we do not overlook the statement in *ITT Commercial Finance* that "review is essentially *de novo.*" 854 S.W.2d at 376[4]. That statement must be read in context with a later statement in *ITT Commercial Finance* that inasmuch as "the trial court's judgment is founded on the record submitted and the law, an appellate court need not defer to the trial court's order granting summary judgment." *Id.* at 376[6].

■ Those directives make it clear that although the appellate court's *review* is essentially *de novo,* the appellate court's role is, as in all other appeals, to *review*—not to *try* the case *de novo.* Consequently, in our review we shall consider only the trial record. To do otherwise would allow litigants to present a motion for summary judgment to a trial court on one set of facts, and later to an appellate court on different, or additional, facts. We are aware of no authority for such chaos.

■ Plaintiff maintains Kelley's knowledge about the acquisition by Defendants Hughes of an interest in the Woods property was not "legally imputable" to Plaintiff for three reasons. The first, in Plaintiff's words, is:

> "The knowledge imputed to [Plaintiff] was acquired by Kelley when he overheard conversations and not while he was engaged in the scope of his agency or duties for [Plaintiff] and the information he over-

heard did not concern a matter within the scope of his authority or duties[.]"

Before addressing that contention, it occurs to us that one might wonder why the focus is on Kelley when Virgil, president of Humansville Bank, obviously knew everything about the Woods property transaction. Do we not impute Virgil's knowledge to Humansville Bank?

■ The answer is found in *Motor Transportation Springfield v. Orval Davis Tire Co., Inc.,* 585 S.W.2d 195 (Mo.App.S.D.1979):

> "While a corporation ordinarily is bound by the knowledge of its agents ..., *the agent's knowledge of his own unauthorized act,* not brought home to the authorized corporate board, officer or agent, cannot be imputed to the corporation."

*Id.* at 202, citing *Trice v. Lancaster,* 270 S.W.2d 519, 524 (Mo.App.1954).

Defendants, evidently mindful of the above rule, do not argue that Plaintiff was charged with Virgil's knowledge.

The parties have cited numerous cases concerning imputation of an agent's knowledge to the principal. Because the facts of each case are unique to it, a discussion of each would not help resolve the appeal here. Instead, we shall look closely at what Kelley knew and when he knew it.

Kelley obviously knew on March 14, 1986, that the Woods property had been sold. This is established by evidence that a line was marked through the Woods property on the ORE list at the March 14, 1986, board meeting.

Kelley may also have known on March 14, 1986, that the purchasers of the Woods property were the Cahojs; however, the trial record is ambiguous about that.

Undeniably, Kelley notarized the two deeds on April 26, 1986. However, in his affidavit of September 1, 1993, he stated he did not read the deeds and therefore did not learn from them that the Woods property had been sold to the Cahojs, or that they were, by the deed he notarized, transferring a half interest to the Hugheses.

The trial record does establish that sometime in 1986, Kelley overheard conversations between Edward Cahoj and Virgil in Kelley's office confirming that the Woods property had been conveyed to the Cahojs, who in turn had transferred a half interest to the Hugheses.

The trial record also demonstrates Kelley knew, in 1986, that Virgil was authorized to sell land owned by Humansville Bank which appeared on the ORE list. Thus, sometime in 1986 Kelley knew Virgil, acting for Humansville Bank, sold the Woods property from the ORE list to the Cahojs, who thereafter deeded a half interest back to the Hugheses.

However, there is nothing in the trial record showing Kelley knew, in 1986, that Virgil did not disclose the transaction to the board of directors (if indeed he did not). There is likewise nothing in the trial record establishing that Kelley knew, in 1986, that the consideration received by Humansville Bank for the Woods property was inadequate (if indeed it was). Furthermore, there is nothing in the trial record demonstrating Kelley had any responsibility for ORE sales in 1986 except to strike the property from the ORE list when told by Virgil that it had been sold.

Thus, when Defendants proclaim that Kelley had "knowledge of the alleged fraudulent transaction," they are overstating the trial record. While there is no genuine issue about Kelley's knowledge in 1986 that the Woods property was sold from the ORE list to the Cahojs, who thereafter deeded a half interest to the Hugheses, there is nothing in the trial record establishing that Kelley had knowledge of any facts indicating the transaction was, in the words of Plaintiff's petition, "constructively fraudulent" as to Humansville Bank.

Furthermore, there is nothing in the trial record establishing that Kelley had any responsibility or authority to examine, monitor, or approve ORE sales in 1986. There is likewise nothing in the trial record demonstrating that Kelley, after learning of the Woods property transaction in 1986, had any responsibility or authority to conduct an after-the-fact investigation to determine whether there were any improprieties.

Defendants cite no case holding that a principal is charged with knowledge of a fraud if one of its agents has knowledge of some facts which, coupled with other facts unknown to the agent, arguably constitute the fraud, where the agent has no authority or responsibility to investigate. Such a holding would be at odds with the following principle from Restatement (Second) of Agency, § 275, comment d (1958):

> "The principal is bound only by the agent's knowledge which appears to be important in view of the agent's duties and prior knowledge. The principal is not affected by information acquired by an agent which seems irrelevant to him because he does not know that ... another agent of the principal is transacting business in which such knowledge is relevant."

*See also:* Illustration 8, *id.*

Analogous, though not identical, circumstances existed in *Evanston Bank v. Conti-Commodity Services, Inc.,* 623 F.Supp. 1014 (N.D.Ill.1985). There, a bank lost some $1,200,000 in one year by trading in commodities. The bank sued the commission merchant and the broker, alleging they traded excessively and unnecessarily to generate commissions. They maintained they complied with the bank's instructions to send daily reports of the trades to the bank's cashier. Because the bank did not disavow any trade during the period in dispute, the defendants argued the bank, by silence, ratified the trades.

The federal court, applying Illinois law, held summary judgment was improper in that only a trier of fact could determine whether the daily reports legally represented knowledge which could be imputed to the bank. *Id.* at 1034. The court noted the cashier described his duties regarding the reports as "recording the data on them in corporate books." *Id.* at 1035. There was no showing that the cashier had a duty to analyze the reports and report his analysis to his superiors. *Id.*

Defendants seek to clothe Kelley with more authority than the trial record demonstrates he possessed. Defendants assert that in 1986, Kelley was "one of three individuals trusted to run the Bank independently and without any other officer or director present at the Bank."

Defendants evidently base that declaration on evidence that in 1986 there were possibly occasions when, because of the absence of Barbara Hensley and Virgil, Kelley was the highest ranking person at Humansville Bank. However, nothing in the trial record indicates his authority was enhanced on such occasions.

Kelley's elevation to the board of directors in 1987 does not affect the outcome. There is no showing that he learned anything in 1987 beyond what he knew in 1986, nor does the trial record indicate that upon becoming a director, Kelley had any duty to investigate antecedent ORE transactions.

In sum, the trial record fails to demonstrate that the facts about which there is no genuine issue are sufficient to establish that Defendants have "the undisputed right to judgment as a matter of law," *ITT Commercial Finance,* 854 S.W.2d at 380[12], on the statute of limitation defense.

*The judgment is reversed and the cause is remanded to the trial court for further proceedings.*

FLANIGAN, P.J., and PREWITT, J., concur.